Severin **HJELLE** et al., Plaintiffs,

v.

James W. **BROOKS**, Commissioner of Fish & Game for the State of Alaska, et al., Defendants.

Civ. A. No. A–191–73.

United States District Court, D. Alaska.

April 30, 1974.

Avrum Gross, Juneau, Alaska, Douglas M. Fryer, Seattle, Wash., for plaintiffs.

James N. Reeves, Asst. Atty. Gen. of Alaska, Dept. of Law, Juneau, Alaska, for defendants.

## OPINION

Before WRIGHT, Circuit Judge, and PLUMMER and VON DER HEYDT, District Judges.*

EUGENE A. WRIGHT, Circuit Judge:

Plaintiffs are crab fishermen from the State of Washington who seek injunctive and declaratory relief on the ground that certain regulations of the State of Alaska relating to the control of crab fishing in the Bering Sea are unconstitutional. At the request of plaintiffs this three-judge district court was convened to adjudicate these claims. The defendants are state officials charged with enforcement of fish and game regulations and have been represented here by the Alaska Attorney General. Since oral argument, the state also has made an appearance and, for practical purposes, is considered a party defendant.

We consider now only defendants' motion to dissolve this three-judge court and plaintiffs' motion for a preliminary injunction. We conclude that the three-judge court was properly convened, and we grant the motion for preliminary injunction.

The Alaska Board of Fish and Game has promulgated certain regulations aimed at controlling crab fishing in an area officially designated as the Bering Sea Shellfish Area. It is described as

* Hon. Eugene A. Wright, Judge of the United States Court of Appeals for the Ninth Circuit, Hon. Raymond E. Plummer, and Hon. James A. von der Heydt, United States District Court for the District of Alaska, constituting a statutory three-judge district court by designation of Hon. Richard H. Chambers, Chief Judge of the United States Court of Appeals for the Ninth Circuit, dated December 14, 1973.

including "all waters of the Bering Sea . . . except Bechevin Bay and Isanotski Strait . . ., north of 54° 36′ N. lat., . . . south of 60° N. lat., and east of the U. S.—Russian Convention Line of 1867." 1973 Commercial Fishing Regulations, 5 AAC 07.100. The area extends hundreds of miles west of Alaska's shoreline. The Board of Fish and Game established by regulation that the king crab fishing season in this area will be closed each year when 23,000,000 pounds of king crab have been taken during the period of June 15 through March 31. 5 AAC 07.760. The Board further established that it is unlawful to transport, possess, buy, or sell any king crab and certain other sealife "taken in violation of the rules and regulations promulgated by the board," if such crab is taken "in any waters seaward of that officially designated as the territorial waters of Alaska. . . ." 5 AAC 36.040.

Plaintiffs actively engage in crab fishing in the Bering Sea and transport their crab to Alaska where it is sold and transported for resale in other states or in foreign countries. On September 9, 1973, the quota of 23,000,000 pounds of king crab was reached and, pursuant to an emergency field order, the crab fishery in the Bering Sea Shellfish Area was closed until June 15, 1974. In December plaintiffs commenced this action and moved for a three-judge court and for a preliminary injunction enjoining the defendant state officials from enforcing the disputed regulations.

I

THREE-JUDGE DISTRICT COURT JURISDICTION

Congress has provided that only a three-judge district court may enjoin the enforcement of a state statute or state administrative order made under a state statute upon the ground of the statute's unconstitutionality. 28 U.S.C. § 2281. Congress intended this procedure to benefit states by providing "procedural protection against an improvident statewide doom by a federal court of a state's legislative policy." Phillips v. United States, 312 U.S. 246, 251, 61 S. Ct. 480, 483, 85 L.Ed. 800 (1941); see Swift & Co. v. Wickham, 382 U.S. 111, 116–119, 86 S.Ct. 258, 15 L.Ed.2d 194 (1965); Currie, The Three-Judge District Court in Constitutional Litigation, 32 U.Chi.L.Rev. 1, 3–9 (1964). It has long been settled that courts must strictly construe this statute, viewing it "as an enactment technical in the strict sense of the term and to be applied as such." Phillips v. United States, *supra* at 251; Board of Regents v. New Left Education Project, 404 U.S. 541, 545, 92 S.Ct. 652, 30 L.Ed.2d 697 (1972); Swift & Co. v. Wickham, *supra* at 124.

Plaintiffs challenge only the unconstitutionality of certain regulations issued by the Alaska Board of Fish and Game, and they mount no attack on the statutes under which those regulations were issued. *See* Alaska Stat. §§ 16.10.190–16.10.220. Mindful of our obligation to construe 28 U.S.C. §§ 2281 with narrow precision, we note that the section, given a literal interpretation, does not seem to require a three-judge court when only the unconstitutionality of an administrative order is at issue. Rather, it appears that the statute underlying the order must also be attacked as unconstitutional.[1] The Supreme Court has held, however, that the section is to be taken more broadly. The apparent differentiation between state statutes and state administrative orders seems to be the result of congressional oversight

---

1. 28 U.S.C. § 2281 provides:

An interlocutory or permanent injunction restraining the enforcement, operation or execution of any State statute by restraining the action of any officer of such State in the enforcement or execution of such statute or of an order made by an administrative board of commission acting under State statutes, shall not be granted by any district court or judge thereof *upon the ground of the unconstitutionality of such statute* unless the application therefor is heard and determined by a district court of three judges under section 2284 of this title.

[Emphasis added.]

rather than design. Oklahoma Natural Gas Co. v. Russell, 261 U.S. 290, 292, 43 S.Ct. 353, 67 L.Ed. 659 (1923); *see also* Alabama Public Service Commission v. Southern Railway Co., 341 U.S. 341, 343–344 n. 3, 71 S.Ct. 762, 95 L.Ed. 1002 (1951); Dorado v. Kerr, 454 F.2d 892, 895 (9th Cir. 1972).

■ This case is one required to be heard and determined by a three-judge court if the challenged regulations have statewide application or effectuate a statewide policy, Board of Regents v. New Left Education Project, 404 U.S. 541, 542, 92 S.Ct. 652, 30 L.Ed.2d 697 (1972), and if the attack on the regulations is not "constitutionally insubstantial." Goosby v. Osser, 409 U.S. 512, 518, 93 S.Ct. 854, 35 L.Ed.2d 36 (1973).

## A. *The "Statewide" Requirement*

Because the challenged regulations in this case pertain only to the king crab industry in the Bering Sea, there is some question whether they are regulations of statewide concern. The requirement that a three-judge court be convened only when the challenged statute is of a statewide character reflects both the purpose of § 2281 (to prevent a single judge from paralyzing an entire regulatory scheme on a statewide basis by issuing a broad injunctive order) and the dangers inherent in the three-judge court procedure. As Mr. Justice Frankfurter observed in Florida Lime & Avacado Growers, Inc. v. Jacobsen, 362 U.S. 73, 92–93, 80 S.Ct. 568, 579, 4 L.Ed.2d 568 (dissenting opinion):

> [T]he convening of a three-judge trial court makes for dislocation of the normal structure and functioning of the lower federal courts, particularly in the vast non-metropolitan regions; and direct review of District Court judgments by this Court not only expands this Court's obligatory jurisdiction but contradicts the dominant principle of having this Court review decisions only after they have gone through two judicial sieves. . . .

The State of Alaska contends that a three-judge court has no jurisdiction if the geographical application of the challenged regulations is less than statewide *or* if the effects of the law are of only local significance. *See* Currie, The Three-Judge District Court in Constitutional Litigation, 32 U.Chi.L.Rev. 1, 32 n. 179 (1964). We do not agree that this is the proper test to be applied.

In Moody v. Flowers, 387 U.S. 97, 87 S.Ct. 1544, 18 L.Ed.2d 643 (1967), the Supreme Court vacated the judgment of a three-judge court in a suit to enjoin enforcement of a state statute prescribing the method of election applicable only to a single county of the state. The Court stated that a three-judge court is authorized "only when a state statute of general and statewide application is sought to be enjoined . . . [and not when] an action is brought against state officers performing matters of purely local concern." *Id.* at 101–102. We agree with the First Circuit that this language suggests that a simple reference to the geographical application of a statute does not end the inquiry:

> As the reference in Moody v. Flowers . . . to "purely local concern" suggests, single judge jurisdiction is premised not only upon local impact [geographically] but upon the absence from the challenged state statute of a significant expression of statewide policy.

Ortiz v. Colon, 475 F.2d 135, 136 (1st Cir. 1973).

More recently, in Board of Regents v. New Left Education Project, 404 U.S. 541, 92 S.Ct. 652, 30 L.Ed.2d 697 (1972), the Supreme Court seemed to draw further from a strict geographical test. It stated that a three-judge court is required when the challenged statute has "statewide application *or* effectuates a statewide policy . . . [b]ut . . . not . . . where the statute or regulation is of only local import." *Id.* at 542. [Emphasis added.] The Court confirmed the propriety of an earlier decision wherein it upheld a three-judge court's consideration of a state statute that had purely local impact but was

"expressive of an official, statewide policy. . . ." *Id.* at 544 n. 2.

 Therefore the test to be applied, as we perceive it, is whether the regulations challenged in this case are expressive of and effectuate a statewide concern and thus have more than merely local import. *See* Ortiz v. Colon, *supra*; Dubois v. Louisiana, 339 F.Supp. 685, 689 (E.D.La.1972).

 Alaska's own arguments against plaintiffs' motion for a preliminary injunction compel our conclusion that this test is satisfied. The Alaska legislature has enacted legislation specifically aimed at controlling and developing Alaska's king crab industry. Sess.Law Alaska ch. 114, § 1 (1965); Alaska Stat. § 18.-90.010; *see* Alaska Stat. §§ 16.10.180–16.10.250. Alaska contends that the challenged regulations are necessary to protect this industry, "a multi-million dollar resource which is one of the mainstays of the economy of Western Alaska . . . ." We can only conclude that the regulations are therefore of significant statewide concer. *See* Dubois v. Louisiana, *supra* at 689.

B. *Is Plaintiffs' Challenge "constitutionally insubstantial"?*

 We next consider whether plaintiffs' attack on the regulations is "constitutionally insubstantial" for the purposes of 28 U.S.C. § 2281, in which case a three-judge court would not be required. A constitutional claim is insubstantial only if "its unsoundness so clearly results from the previous decisions of [the Supreme Court] as to foreclose the subject and leave no room for the inference that the question sought to be raised can be the subject of controversy." Goosby v. Osser, 409 U.S. 512, 518, 93 S.Ct. 854, 859, 35 L.Ed.2d 36 (1973), quoting Ex parte Poresky, 290 U.S. 30, 32, 54 S.Ct. 3, 78 L.Ed. 152 (1933). Prior Supreme Court decisions must render the claims frivolous; "claims of doubtful or questionable merit do not render them insubstantial . . . ." *Id.*

Plaintiffs challenge the regulations on three bases. They claim (1) that the regulations impose an unreasonable burden on interstate commerce; (2) that the regulations violate the due process clause of the Fourteenth Amendment by purporting to regulate a fishery outside the territorial waters of the State of Alaska; and (3) that the regulations violate the supremacy clause because they are in conflict with or are preempted by federal statutes, treaties, and executive agreements.

 A claim predicated on the supremacy clause cannot support a finding of jurisdiction under 28 U.S.C. § 2281. Swift & Co. v. Wickham, 382 U.S. 111, 86 S.Ct. 258, 15 L.Ed.2d 194 (1965). The jurisdiction of this three-judge court must therefore rest on plaintiffs' due process or commerce clause claim. While these claims are raised independently, we view them as being intertwined, and we perceive the essence of plaintiffs' complaint to be grounded on an asserted denial of due process. Plaintiffs contend basically that Alaska's regulations constitute an attempt by Alaska to assert control over an area totally beyond her jurisdiction, without any legitimate state interest to justify such extraterritorial regulation. We find that this contention states a claim that is not constitutionally insubstantial on its face; indeed, we conclude below that the likelihood of plaintiffs' success on this claim is sufficiently high to justify our granting a preliminary injunction. We therefore conclude that this three-judge court has jurisdiction to hear and determine this case.

## II

### EQUITABLE RESTRAINT

The state suggests that, on the basis of an extension of Younger v. Harris, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), this court should exercise restraint in granting injunctive relief. It is urged that plaintiffs have an adequate remedy at law since their claims could readily be asserted in defense of a state court prosecution. The state

claims further that there is presently pending in an Alaska state court a criminal prosecution involving an alleged violation of the regulations in question here.

At the outset we note that plaintiffs present an "actual controversy" as required by Art. III of the Constitution. Plaintiffs allege that they must choose between, on the one hand, intentionally violating a state law and thereby subjecting themselves to the very real possibility of a criminal prosecution and, on the other hand, foregoing what they believe to be constitutionally protected activity. That plaintiffs are faced with a very real threat of prosecution is amply demonstrated by the current prosecution of another for violating the regulations challenged here. Steffel v. Thompson, 415 U.S. 452, 458, 94 S.Ct. 1209, 39 L. Ed.2d 505, 42 U.S.L.W. 4357, 4359 (Mar. 19, 1974).

The actuality of the threat is further evidenced by the state's claim that plaintiffs are adequately protected at law because they could challenge the constitutionality of the regulations in the defense of a state court prosecution, which the state would presumably initiate soon after plaintiffs chose to violate the regulations. In these circumstances "it is not necessary," as the Supreme Court recently stated in Steffel v. Thompson, *supra*, "that [plaintiffs] first expose [themselves] to actual arrest or prosecution to be entitled to challenge a statute that [they claim] deters the exercise of [their] constitutional rights."

We now consider whether this case is appropriate for injunctive relief. The Supreme Court held in Younger v. Harris, *supra*, that when a state criminal proceeding under a disputed state criminal statute is pending against a federal plaintiff at the time his federal complaint is filed, principles of equity, comity, and federalism preclude issuance of a federal injunction restraining enforcement of the criminal statute unless bad faith enforcement or other special circumstances are demonstrated.

Samuels v. Mackell, 401 U.S. 66, 91 S. Ct. 764, 27 L.Ed.2d 688 (1971), went on to hold that similar considerations preclude issuance of a declaratory judgment in all but unusual circumstances. *Samuels* reserved the question, however, whether declaratory relief is precluded when a state prosecution has been threatened, but is not pending, and there has been no showing of bad faith enforcement or other special circumstances.

The Supreme Court has now answered this question, holding that federal declaratory relief is *not* precluded when a prosecution based on an assertedly unconstitutional state statute has been threatened but is not pending, even when there has been no showing of bad-faith enforcement. Steffel v. Thompson, 415 U.S. 452, 94 S.Ct. 1209, 39 L.Ed.2d 505, 42 U.S.L.W. 4357 (Mar. 19, 1974).

The Court noted but did not resolve the question, of concern to us in this case, "whether a showing of irreparable injury might be made in a case where, although no prosecution is pending or impending, an individual demonstrates that he will be required to *forego* constitutionally protected activity in order to avoid arrest." 42 U.S.L.W. 4361 n. 12 [94 S.Ct. 1218]. We here answer that question in the affirmative.

We note initially that we are considering here the injunction pendente lite of prosecutions for plaintiffs' *future* conduct. This is a significant point of distinction from those cases where, as the Court pointed out in *Steffel*, sufficient injury was not found to warrant injunctive relief restraining an imminent, but not yet pending, prosecution for *past* conduct. Steffel v. Thompson, *supra*, 42 U.S.L.W. 4361 n.12, [94 S.Ct. 1209] and cases cited therein.

In the absence of a pending or impending state proceeding against plaintiffs, the relevant principles of equity, comity, and federalism have little force. Steffel v. Thompson, *supra*, at 4360, [94 S.Ct. 1209]; Lake Carriers' Assn. v. MacMullan, 406 U.S. 498, 509, 92 S.Ct. 1749, 32 L.Ed.2d 257 (1972). Federal

intervention "does not result in duplicative legal proceedings or disruption of the state criminal justice system;" nor can it be interpreted "as reflecting negatively upon the state court's ability to enforce constitutional principles." Steffel v. Thompson, *supra*, at 4360 [94 S. Ct. at 1217].

In addition, those in the position of plaintiffs in the present case are confronted with a dilemma aptly described by Mr. Justice Brennan speaking for the Court in *Steffel, supra*:

> [W]hile a pending state prosecution provides the federal plaintiff with a concrete opportunity to vindicate his constitutional rights, a refusal on the part of the federal courts to intervene when no state proceeding is pending may place the hapless plaintiff between the Scylla of intentionally flouting state law and the Charybdis of foregoing what he believes to be constitutionally protected activity in order to avoid becoming enmeshed in a criminal proceeding.

■■ The state does not persuade us that plaintiffs are adequately protected either by their own possible future prosecution or by the current prosecution of others for violating the disputed regulations. Plaintiffs have no assurance that those presently being prosecuted will challenge the constitutionality of the regulations as plaintiffs do here. And an alternative which forces plaintiffs to subject themselves to potential criminal penalties to vindicate what they believe

to be their constitutional rights is not "an adequate remedy at law."

■ Plaintiffs seek injunctive and declaratory relief, and we may ultimately conclude that, at most, only declaratory relief is proper. At this stage in the litigation, however, we deem it appropriate to consider whether a preliminary injunction should issue.[2]

## III

### PRELIMINARY INJUNCTION

■ It is within this court's discretion to grant a preliminary injunction enjoining enforcement of the regulations if we find (1) that it is likely or "reasonably certain" that plaintiffs will prevail at the trial on the merits; (2) that plaintiffs will suffer irreparable harm if the injunction is denied; and (3) that, on balance, the damage to plaintiffs in the absence of an injunction outweighs the foreseeable harm to the State of Alaska if the injunction is granted. *See* Sierra Club v. Hickel, 433 F.2d 24 (9th Cir. 1970), aff'd, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972); 7 Moore's Federal Practice, ¶ 65.04 [1], 65–39 (2d ed. 1974). In considering the third requirement, the public's interest in the object of the preliminary injunction may also be given weight. *See* King v. Saddleback Junior College Dist., 425 F.2d 426, 427 (9th Cir. 1970). We find each of these requirements satisfied, and we grant the motion for preliminary injunction.

2. While the state does not raise the issue of abstention, we have considered it *sua sponte*, and we conclude that we need not abstain from considering this case. The abstention doctrine involves a question "entirely separate from the question of granting declaratory or injunctive relief," Lake Carriers' Assn. v. MacMullan, 406 U.S. 498, 509 n. 13, 92 S.Ct. 1749, 1756, 32 L.Ed.2d 257 (1972), and it is appropriately invoked when there is ambiguity in a state statute that can be resolved by a state tribunal, thus avoiding a federal constitutional question. Wisconsin v. Constantineau, 400 U.S. 433, 438–439, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971); Zwickler v. Koota, 389 U.S. 241, 249, 88 S.Ct. 391, 19 L.Ed.2d 444 (1967). The abstention doctrine is not,

however, "an automatic rule applied whenever a federal court is faced with a doubtful issue of state law; it rather involves a discretionary exercise of a court's equity powers." Baggett v. Bullitt, 377 U.S. 360, 375, 84 S.Ct. 1316, 1324, 12 L.Ed.2d 377 (1964).

Plaintiffs do not challenge the disputed regulations as they are applied, but rather upon their face. Any uncertainty in the language of these regulations is not such that construction by an Alaska state court might "avoid or fundamentally alter the constitutional issue raised in this litigation." Baggett v. Bullitt, *supra* at 376. As such, we deem abstention unnecessary, and perhaps inappropriate, in this case.

As stated above, plaintiffs present a three-pronged challenge to the regulations, claiming that they violate the due process, commerce, and supremacy clauses of the Constitution.

The supremacy clause challenge, while inadequate in itself to establish the jurisdictional basis of a three-judge court, may be considered by this court when considering whether to grant the preliminary injunction. Rosado v. Wyman, 397 U.S. 397, 402, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1970); Doe v. Lukhard, 493 F.2d 54 at 58 ·(4th Cir. 1974). A state law is invalid under the supremacy clause when according to the preemption doctrine, that law either directly conflicts with a federal scheme of regulation or there is a congressional design to preempt the entire field. Florida Avocado Growers v. Paul, 373 U.S. 132, 141, 83 S.Ct. 1210, 10 L.Ed.2d 248 (1963).

Plaintiffs contend that the Outer Continental Shelf Lands Act, 43 U.S.C. §§ 1331–1343, evidences the intent of Congress to preempt any state regulation in areas beyond a three-mile state limit described in 43 U.S.C. § 1312. Plaintiffs support this contention by reference to the language of the Act, its legislative history, and related legislation. Plaintiffs further contend that the disputed regulations are preempted by agreements presently in effect between the United States and Russia and the United States and Japan. These agreements regulate crabbing in an area overlapping that to which the regulations apply. They establish limits as to size, sex, and amounts of crab that may be taken by Japan and Russia and they also set gear requirements for crabbing vessels.

The State of Alaska responds that the Outer Continental Shelf Lands Act is directed at minerals rather than crabs, and that Congress has certainly not intended to preempt state regulation of crabbing. Alaska cites excerpts from the Act and its legislative history in support of this contention. The state contends further, with regard to the agreements with Japan and Russia, that enforcement of the state regulations, which are aimed at United States fishermen, neither impairs any rights under the agreements nor breaks any obligations.

At this incipient stage of the litigation the court does not conclude that plaintiffs are "reasonably certain" to succeed ultimately on the basis of their supremacy clause argument. The complexity of the issues involved, magnified by the necessity to probe deeply into legislative history to determine the intent of Congress in enacting the Outer Continental Shelf Lands Act, does not lend itself to resolution at this stage of the litigation. As to the treaties, plaintiffs lack standing to invoke them on their behalf, for plaintiffs are "not in a position to invoke the rights of other governments or of the nationals of other countries." Skiriotes v. Florida, 313 U.S. 69, 74, 61 S.Ct. 924, 928, 85 L.Ed. 1193 (1941).

We are more immediately persuaded, however, by plaintiffs' due process and commerce clause arguments. Plaintiffs argue that the disputed regulations are unconstitutional because they expressly purport to regulate crabbing beyond Alaska's territorial boundaries. The state seeks to implement such regulation by enforcing what is commonly called a "landing law," which prohibits the possession, sale, or transportation in Alaska of crab "taken in any waters seaward of that officially designated as the territorial waters of Alaska . . . . ." AAC 36.040.

The state makes two responses to this argument. First, its Attorney General contends that the Bering Sea Shellfish Area is subject to regulation because it is wholly within Alaska's political boundaries. Relying on Manchester v. Massachusetts, 139 U.S. 240, 264, 11 S.Ct. 559, 35 L.Ed. 159 (1891), the state argues that it may unilaterally extend its maritime boundaries on the sea to the extent of its territorial limits so long as it does not conflict with federal

and international law. Second, Alaska contends that even if parts of the Bering Sea Shellfish Area are outside its political boundaries, state fish and game conservation laws may constitutionally be applied extraterritorially if necessary to protect state fish and game.

 In considering the first contention, we note initially that, on its face, the language of Manchester v. Massachusetts lends support to Alaska's claimed ability to assert jurisdiction over the Bering Sea.[3] *Manchester*, however, involved only a state's right to control fisheries in a bay contained in what is traditionally called a state's inland waters. *See* Askew v. American Waterways Operators, Inc., 411 U.S. 325, 334, 93 S.Ct. 1590, 36 L.Ed.2d 280 (1973). Here, on the other hand, we are concerned with Alaska's asserted jurisdiction over the marginal and high seas lying off her coast. This is significant in light of the Supreme Court's recent restriction of the apparent breadth of *Manchester*. In United States v. California, 381 U.S. 139, 168–169, 85 S.Ct. 1401, 1417, 14 L.Ed.2d 296 (1965), the Court stated:

> California relies upon Manchester v. Com. of Massachusetts, 139 U.S. 240, 11 S.Ct. 559, 35 L.Ed. 159, for the proposition that a State may draw its boundaries as it pleases within limits recognized by the law of nations regardless of the position taken by the United States. Although some dicta in the case may be read to support that view, we do not so interpret the opinion. The case involved neither an expansion of our traditional international boundary nor opposition by the

United States to the position taken by the State.

We need not further consider the merits of this issue, however, since it appears to us, upon reference to the language of the disputed regulations and the statutes under which they were promulgated, that Alaska does not in fact consider the entire Bering Sea Shellfish Area to be within its territorial waters. Indeed, those enactments expressly purport to apply to extraterritorial waters rather than to waters within Alaska's boundaries.

In Alaska's statehood act, Congress described Alaska's maritime boundaries as "the territorial waters appurtenant" to the territory then included in the Territory of Alaska. Act of July 7, 1958, 72 Stat. 339. *See also* Alaska Const., Art. XII, § 1. The Alaska legislature passed a series of statutes aimed at conserving migratory fish and shellfish inside these territorial waters. Alaska Stat. §§ 16.10.180–16.10.250. The legislature found that migratory fish are present "inside and outside the territorial waters of the state;" that fish "taken from the waters of the state are indistinguishable . . . from those taken from the adjacent high seas;" and that enforcement of laws conserving fish inside the waters of the state is facilitated by making certain of those laws "applicable to the adjacent high sea areas . . . ." Alaska Stat. § 16.10.180. It is thus clear that the legislature did not envision the high seas adjacent to Alaska as being formally within Alaska's boundaries, for those high seas are in fact distinguished several times from the territorial waters of the state.[4]

3. The Supreme Court stated in Manchester v. Massachusetts, 139 U.S. 240, 264, 11 S.Ct. 559, 564, 35 L.Ed. 159 (1891), that:

The extent of the territorial jurisdiction of Massachusetts over the sea adjacent to its coast is that of an independent nation; and, except so far as any right of control over this territory has been granted to the United States, this control remains with the state. . . . Within what are generally recognized as the territorial limits of States by the law of nations, a State can define its boundaries on the sea and the boundaries of its

counties; and by this test the commonwealth of Massachusetts can include Buzzard's Bay within the limits of its counties.

4. The state could argue that this construction is not consistent with Alask.Stat. § 44.03.010. That statute provides in part:

The jurisdiction of the state extends to waters offshore from the coast of the state as follows:

. . . . .

(2) The high seas to the extent that jurisdiction is claimed by the United States of

Reference to regulations promulgated to carry out the purpose of these statutes [*see* Alask.Stat. § 16.10.190] further supports our conclusion that Alaska does not consider the entire Bering Sea Shellfish Area to be formally within its territorial waters. In fact, one of the key regulations in dispute—the "landing law" that prohibits the possession, sale, or transportation in Alaska of certain fish and shellfish—applies only to sealife "taken in any waters [of the Bering Sea Shellfish Area] *seaward of that officially designated as the territorial waters of Alaska* . . . ." 5 AAC 36.-040. [Emphasis added.] Therefore, we need not decide whether Alaska could include the entire Bering Sea Shellfish Area within its boundaries. We merely note that it has not.

That the regulated conduct was extra-territorial to the State of Alaska does not, however, end the inquiry. Alaska argues that there is a sufficient nexus between the regulated conduct and a legitimate state interest to justify the regulation. The nexus proffered by the state is that the regulations are necessary to conserve the crab fishery within the state. For this conclusion, Alaska relied on a long line of cases upholding the constitutionality of certain state statutes regulating fish and wildlife taken beyond a state's territorial limits.

In Silz v. Hesterberg, 211 U.S. 31, 29 S.Ct. 10, 53 L.Ed. 75 (1908), the Supreme Court upheld New York laws prohibiting the possession of game in New York during a closed season, including game brought in from outside the state.

The Court stated that the laws were aimed not at affecting the legality of taking game outside the state, but rather at protecting game located in the state. It concluded on this basis that the laws did not violate the due process clause of the Fourteenth Amendment. The Court also concluded that the laws did not unlawfully regulate interstate commerce because the effect on commerce was only incidental and remote. *Id.* at 40–41.

In Bayside Fish Co. v. Gentry, 297 U. S. 422, 56 S.Ct. 513, 80 L.Ed. 772 (1936), the Court upheld certain California fish and game laws that regulated the processing of sardines in California, whether the sardines were taken within the waters of the state or outside them. The purpose of the regulation, the Court found, was to conserve for food the fish found in state waters. The provisions regulated only manufacture within the state, and their direct operation, intended and actual, was wholly local. The Court found any effect on interstate and foreign commerce to be "purely incidental, indirect, and beyond the purposes of the legislation." *Id.* at 426. To the extent the laws dealt with the use or treatment of fish brought into the state from outside, the Court stated, their legal justification rested on the ground that they operated "as a shield against the covert depletion of the local supply, and thus tend[ed] to effectuate the policy of the law by rendering evasion of it less easy." *Id.*

Other courts have upheld similar laws on similar bases. *See* Frach v. Schoet-

America, or to the extent recognized by the usages and customs of international law or by agreement to which the United States of America or the state is a party.

(3) Submerged lands including the subsurface of submerged lands, lying under the waters mentioned in this section.

In light of this statute, Alaska could argue, the federal government's extension of jurisdiction over the Outer Continental Shelf represented an extension of Alaska's boundaries as well. Congress expressly provided in the Outer Continental Shelf Lands Act, however, that it was asserting jurisdiction only over the subsoil and seabed of the Shelf, not over the "high seas of the waters above the Outer Continental Shelf . . . ." 43 U.S.C. § 1332(a) and (b). Therefore, since the United States asserts no jurisdiction over the high seas above the Shelf, subsection (2) of the Alask.Stat. § 44.03.010 does not support a claim by Alaska of jurisdiction over those waters. Similarly, where neither the United States nor Alaska asserts jurisdiction over those high seas, subsection (3) of that statute does not support a claim by Alaska of jurisdiction over the submerged lands underlying those high seas.

tler, 46 Wash.2d 281, 280 P.2d 1038 (1955); Johnson v. Gentry, 220 Cal. 231, 30 P.2d 400 (1934); Santa Cruz Oil Corp. v. Milnor, 55 Cal.App.2d 56, 130 P.2d 256 (1942). In each, the courts found that it was a valid exercise of police power for states to attempt to conserve fish located in state waters. The courts found further that this power includes the right to prohibit possession of fish taken outside the state or, in the case of *Santa Cruz Oil, supra*, to require a permit for any fishing boat operating in state waters, even if the boat caught all of its fish outside the state. Courts have found the effects of these laws on interstate commerce to be incidental and necessary to prevent possible deception by the fishermen: fishermen might otherwise subvert the conservation efforts of the states by fishing in state waters but claiming that they took their catch beyond those waters. The inability to distinguish fish taken within the state from those taken outside would render enforcement of the state laws difficult at best.

This line of cases leads us to conclude that Alaska's proffered nexus between its legitimate state interests and its regulation of certain extraterritorial conduct would pass constitutional muster if its regulations were directed at conserving the crab fishery *within* Alaska's waters by regulating crabbing in that area and, *in order to facilitate enforcement*, by prohibiting the possession of crab in the state during the closed season, even if that crab were caught outside the state. Despite the state's claim that the regulations are on "all fours" with these "landing law" cases, we find, after considering the language of the regulations and the affidavits presented by both parties, that plaintiffs are "reasonably certain" to establish that the regulations do not fall within the purview of these cases.

We reach this conclusion because the regulations appear to be directly concerned with conserving crab not only in Alaska but in the entire Bering Sea Shellfish Area, an area extending hundreds of miles beyond Alaska's territorial waters. We note, for example, that the regulations purport to close the crab fishery in the entire area after the quota of 23,000,000 pounds of crab has been reached. 5 AAC 07.760. We note further that one regulation prohibits the possession in Alaska *only* of that crab and sealife "taken *seaward*" of Alaska's territorial waters. Finally, after considering the limited evidence presently before us, it appears to us that the percentage of king crab taken commercially within Alaska waters is very small in comparison to that taken in the rest of the Bering Sea Shellfish Area.

Thus, we conclude that unlike the judicially approved "landing laws," Alaska's regulations have a direct rather than indirect impact on extraterritorial conduct. Alaska's justification for this impact (the need to facilitate enforcement of state regulations aimed at conserving the crab fishery within Alaska's waters) simply does not seem to provide a nexus sufficient to withstand constitutional attack.

In so holding, we intimate no opinion whether Alaska may have other legitimate interests sufficient to justify its regulation of crabbing in the Bering Sea Shellfish Area. We merely find, on the basis of the affidavits and memoranda presently before us, that conservation of in-state crab through the disputed regulations is not one. The defendants will have an opportunity at the trial on the merits to present any other nexus they believe justifies the regulations. The state has alluded to, but has not pressed, the dependence of Alaska's shore-based crab processing industry on crabbing in the Bering Sea. While defendants are not precluded from developing this line of argument more fully at the trial on the merits, they have not offered sufficient evidence as yet to support the required nexus.

For purposes of determining the propriety of a preliminary injunction, we find also that plaintiffs are likely to suffer irreparable harm if we do not enjoin enforcement of the regula-

tions. Plaintiffs have shown that they have lost and will continue to lose more than $3,000 per day because of their inability to fish for crab in the Bering Sea and that they are prepared and equipped to fish immediately upon the issuance of this preliminary injunction. While monetary damages are not normally considered irreparable, the Eleventh Amendment prohibits plaintiffs from suing the State of Alaska to recover these damages, Edelman v. Jordan, 415 U.S. 651, 663, 94 S.Ct. 1347, 39 L.Ed.2d 662, 42 U.S.L.W. 4419, 4422 (1974),[5] and we are aware of no statute by which Alaska consents to be sued in a case such as this.

We are not unmindful of Alaska's claim that the harm to the crab industry will be irreparable if we issue a preliminary injunction. We are unpersuaded by this claim, however, it is our opinion that the public interest, which we may consider when ruling on this preliminary injunction, strongly favors the maintenance of the Bering Sea crab resource at a level which is capable of producing a maximum sustained yield. We do not believe, however, that this interest will be jeopardized by a preliminary injunction. We conclude, on balance, that the reasonable certainty of plaintiffs' ultimate success on the merits, coupled with the irreparable harm that they are presently suffering, justifies issuance of the preliminary injunction.

We shall therefore enjoin the defendant officials of the State of Alaska from enforcing the following Commercial Fishing regulations: 5 AAC 07.760 and 5 AAC 36.040.

5. The Eleventh Amendment is applicable even though the State of Alaska is not a named party to this action. The Supreme Court recently stated in Edelman v. Jordan, *supra*, that:

It is also established that even though a State is not named a party to the action, the suit may nonetheless be barred by the Eleventh Amendment. In Ford Motor Co. v. Department of Treasury, 323 U.S. 459, [65 S.Ct. 347, 89 L.Ed. 389] (1945), the Court said:

The foregoing opinion shall constitute the findings of fact and conclusions of law required by Federal Rule of Civil Procedure 52(a).

Counsel for the plaintiffs may prepare an approptiate form of preliminary injunction for the court's approval.

PLUMMER, District Judge (concurring):

While I concur in the opinion of the court, I think more discussion is warranted on the abstention issue. *See* footnote 2 *ante*. The fact that the State did not raise the issue does not preclude its applicability. Wisconsin v. Constantineau, 400 U.S. 433, 437, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971). A review of the record in this case reveals no pleadings or arguments by any plaintiff on any state law ground. The lack of such distinguishes this case from Reetz v. Bozanich, 397 U.S. 82, 90 S.Ct. 788, 25 L. Ed.2d 68 (1970). A review of the record in State of Alaska v. Charles Bundrant, Cr. No. 73–724, a case in the Alaska Superior Court similar to the present one, reveals no pleadings or argument on any state law ground. Thus, Askew v. Hargrave, 401 U.S. 476, 91 S. Ct. 856, 28 L.Ed.2d 196 (1971) is not applicable.

An admittedly superficial review of a line of argument not presented in this case reveals the following: The purpose of the statutes underlying the contested regulations is:

". . . [t]o conserve the migratory fish and migratory shellfish found inside the waters of the state. . . ." A.S. 16.10.180(4).

"[W]hen the action is in essence one for the recovery of money from the state, the state is the real, substantial party in interest and is entitled to invoke its sovereign immunity from suit even though individual officials are nominal defendants." *Id.*, at 464.
Thus the rule has evolved that a suit by private parties seeking to impose a liability which must be paid from public funds in the state treasury is barred by the Eleventh Amendment.

Plaintiff asserts 5 AAC 36.040 has absolutely no rational relation to the protection of any state fishery in arguing that the "landing law" constitutes an unreasonable restraint on interstate and foreign commerce. A.S. 44.62.300 provides for judicial review of state regulations and authorizes an action for declaratory relief in the Alaska Superior Court. The courts will ascertain whether the agency's regulation exceeds the scope of the power delegated by the legislature and will determine whether the regulation is reasonable. Kelly v. Zamarello, 486 P.2d 906 (Alaska 1971). Thus, had this state law ground been presented, the constitutional issue could have possibly been avoided. However, it appears that the abstention doctrine does not extend to such lengths. From the record before this court and from the record before the *Bundrant* Court, abstention is not necessary in this case.

I share the concern of Chief Judge von der Heydt with reference to extending the rationale of Steffel v. Thompson, 415 U.S. 452, 94 S.Ct. 1209, 39 L.Ed.2d 505, 42 U.S.L.W. 4357 (1974), to this non-First Amendment case where no prosecution of the plaintiff is pending or impending and no proscribed past conduct has occurred. *See* 42 U.S.L.W. at 4361 n. 12 [94 S.Ct. 1209]. *See also* Hart and Wechsler, The Federal Courts and the Federal System, 1045–1050 (2d ed.1973). However, this injunction is preliminary and operates effectively only until July 1, 1974, when the season for King Crab opens, and after the 31,-000,000—pound quota is met.[1] If this case is brought to trial soon, the injunction may be in effect for two months.

Concerning the existence of a legitimate state interest in the regulation of the Bering Sea Shellfish Area, it seems to me that the burden of proving such should rest upon the State. Plaintiffs should not be forced to prove a negative on this issue.

VON DER HEYDT, District Judge (dissenting):

I respectfully dissent in two significant areas of the majority opinion.

First, I find that the abstention issue merits further consideration.

Initially, despite the conclusion reached in the majority opinion regarding "equitable restraint", I am unable to agree to the extension of Steffel v. Thompson, 415 U.S. 452, 94 S.Ct. 1209, 39 L.Ed.2d 505, 42 U.S.L.W. 4357 (1974) to permit injunctive relief, even pendente lite, to cases where a federal plaintiff is threatened with imminent, though not pending or impending, state criminal prosecution based on future conduct. See concurring opinion of Mr. Justice Rehnquist, joined by the Chief Justice, in Steffel v. Thompson, *supra*, at 4365 [94 S.Ct. 1209]. That opinion stressed that the law of *Steffel* is limited to instances where declaratory relief is sought in situations involving threatened state criminal prosecution. *Steffel* provides no authority to grant injunctive relief under the circumstances of the instant cause. Mr. Justice Rehnquist points out the limited application of *Steffel* by hypothesizing a situation wherein a federal plaintiff threatened with imminent state criminal prosecution seeks and obtains a favorable declaratory judgment. If the successful federal plaintiff thereafter violated the state statute, considerations of an adequate remedy at law and "our federalism" could very well preclude the issuance of a federal injunction to enforce the declaratory judgment. Steffel v. Thompson, *supra*, at 4366–4367 [94 S.Ct. 1209]. Accordingly, it appears that identical considerations, absent aggravated circumstances or bad faith, would induce a federal court to withhold injunctive relief to a federal plaintiff where the federal plaintiff seeks injunctive relief, as distinguished from declaratory relief. To extend the holding of *Steffel* to include the granting of injunctive relief constitutes an avoidance by circumlo-

---

1. The 23,000,000—pound quota for 1973 was filled between June 15, 1973, and September 6, 1973.

cution of the rationale set forth in Younger v. Harris, 401 U.S. 37, 43–44, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971).

Further, I am reluctant to extend the doctrine of *Steffel,* which represents a long line of First Amendment cases, to this cause, which relates to the constitutional power of a state to preserve its natural resources. *Cf.* Reetz v. Bozanich, 397 U.S. 82, 90 S.Ct. 788, 25 L.Ed. 2d 68 (1970); Bayside Fish Flour Co. v. Gentry, 297 U.S. 422, 56 S.Ct. 513, 80 L.Ed. 772 (1936).

Secondly, I disagree that a preliminary injunction should be ordered under the facts and circumstances of this case, notwithstanding my reservations upon the abstention issue.

a. The majority opinion adopts a set of criteria for the determination of the granting of a preliminary injunction which fails to give proper consideration of the most critical factor raised by the facts of this cause: the public interest. *See* King v. Saddleback Junior College District, 425 F.2d 426, 427 (9th Cir. 1970). *See also* 7 Moore's Federal Practice, § 65.04[1], 65–45 (2nd Ed.1974).

The Bering Sea king crab population data obtained by the National Marine Fisheries Service establishes that the present capacity of commercial fishermen to take king crab far exceeds the estimated maximum sustained yield of the Bering Sea Shellfish Area. Biologists generally agree that productivity of this fishery cannot be sustained absent a regulatory scheme such as that which plaintiffs presently attack. See affidavit of Mr. Larry Edfelt, page 4. No federal regulation of American king crab fishermen in this area exists. It is highly likely that without some regulation by the State of Alaska over this fishery, overfishing will occur, with the destruction of king crab stocks below minimum levels of sustained yield. The eventual impact upon all king crab fishermen (including the plaintiffs), floating and shore-based crab processors, and the economy of western Alaska is difficult to assess. The public interest is not only a critical factor which must be considered in determining whether to grant injunctive relief in this case, in my opinion it is a determinative factor militating against granting the injunction. It also is legally significant that the disputed regulations were promulgated by state officials at the request of federal officials.

b. A preliminary injunction should not be granted where the status quo would be disturbed. King v. Saddleback Junior College District, *supra.* The function of a preliminary injunction is to maintain the status quo pending a determination of the action on the merits. The status quo as of the date this action was commenced was the closure of the Bering Sea Shellfish Area to king crab fishing. Granting the preliminary injunction and permitting plaintiffs to resume fishing without restraint clearly disturbs the status quo.

c. I do not agree that plaintiffs are suffering irreparable harm, even though precluded under the Eleventh Amendment from suing the State of Alaska for damages. Under the 1973 regulations plaintiffs were not precluded from fishing for king crab in other areas of western Alaska or from fishing for tanner crab in the Bering Sea Shellfish Area. Indeed, under the recently-promulgated 1974 regulations, plaintiffs are free to fish for blue king crab in the Bering Sea Shellfish Area from July 1 until June 15. Under the 1974 regulations, there is no quota for blue king crab.

d. In my judgment, it is not sufficiently clear that plaintiffs have demonstrated with reasonable certainty that they will prevail on the merits to warrant granting a preliminary injunction.

Plaintiffs' strongest argument is that based upon the due process clause of the Fourteenth Amendment. Plaintiffs have not shown, with reasonable certainty, that the disputed regulations are an attempt by the State of Alaska to assert control over an area beyond its territorial waters to which the State of Alaska has no legitimate governmental interest.

The majority opinion focuses on the percentage of Bering Sea king crab caught in territorial waters to determine whether the State of Alaska has sufficient interest to regulate the Bering Sea Shellfish Area with Constitutional propriety. The evidence presently before the court relating to the quantity of king crab caught in territorial waters of the State of Alaska remains too conflicting to sustain a conclusion that plaintiffs are reasonably certain to prevail on the merits of their due process claim. The problem is aggravated by the dispute over the precise delineation of the territorial waters of the State of Alaska. Further, I consider that certain interests of the State of Alaska other than those pertaining to the percentage of king crab caught within territorial waters should be considered in determining whether the requisite nexus exists such that due process will not be violated. Those legitimate state interests would include the long-term effect on local king crab fishermen and shore processors, of a reduction of king crab stocks below sustained yield levels. Until more definitive evidence concerning all the legitimate governmental interests of the State of Alaska has been presented to and considered by this tribunal, it appears unduly speculative to conclude at this juncture that plaintiffs are reasonably certain to prevail on the merits.

e. Finally, I do not agree that a balancing of hardships is a factor which weighs in favor of plaintiffs. As earlier stated, plaintiffs' boats are free to fish for king crab in other areas of western Alaska and to fish for tanner crab in the Bering Sea Shellfish Area. Further, the 1974 regulations do not restrict the quota of blue king crab which may be taken in the disputed area. Against the anticipated loss of plaintiffs accruing from a loss of rights to unrestricted king crab fishing in the Bering Sea is balanced the legitimate public interest sought to be protected by the State. As stated earlier, if fishermen were permitted to fish for king crab without restriction in the Bering Sea, it is likely that irreparable damages may be inflicted on another dwindling Alaskan resource. The hardship to be suffered by the persons adversely affected by such irreparable damage outweighs whatever incidental hardship might be incurred by plaintiffs as a result of the fishing restrictions imposed by the subject regulations.

I would deny the motion for preliminary injunction.