The F/V AMERICAN EAGLE, ADF&G No. 39 and $100,677.50 Representing the Proceeds of 143,825 lbs. of Alaska King Crab Delivered Pursuant to ADF&G Fish Ticket No.'s E95626, E95627, Appellant and Cross-Appellee,

v.

STATE of Alaska, Appellee and Cross-Appellant.

STATE of Alaska, Appellant,

v.

The F/V AMERICAN EAGLE, ADF&G No. 39 and $100,677.50 Representing the Proceeds of 143,825 lbs. of Alaska King Crab Delivered Pursuant to ADF&G Fish Ticket No.'s E95626, E95627, Appellee.

Nos. 3973, 3974, 4023.

Supreme Court of Alaska.

Nov. 21, 1980.

Douglas M. Fryer, Moriarty, Mikkelborg, Broz, Wells & Fryer, Seattle, Wash., William B. Rozell, Faulkner, Banfield, Doogan & Holmes, Juneau, for appellant, cross–appellee.

John G. Gissberg, Asst. Atty. Gen., Anchorage, Avrum M. Gross, Atty. Gen., Juneau, for appellee, cross–appellant.

## OPINION

Before RABINOWITZ, C. J., CONNOR, BURKE and MATTHEWS, JJ., and STEWART, Superior Court Judge.

RABINOWITZ, Chief Justice.

This case involves an in rem civil forfeiture proceeding brought for alleged violations of Alaska's laws regulating this state's important king crab fishery. On January 15, 1976, the fishing vessel American Eagle was seized by state officials while it was unloading crab in Pelican, Alaska. The seizure was pursuant to AS 16.05.190–.195,[1] for violating various regulations prohibiting the taking and possession, during closed season, of king crab from the Egg Island district of king crab statistical area "O" in the Aleutian Islands. The vessel's on–board gear and proceeds equal to $100,677.50 from the sale of crab were also

---

1. AS 16.05.190 provides:

*Seizure without warrant and confiscation by court.* Guns, traps, nets, fishing tackle, boats, aircraft; automobiles or other vehicles, sleds, and other paraphernalia used in or in aid of a violation of this chapter, or rule or regulation of the department may be seized under a valid search, or all fish and game, or parts of fish and game, or nests or eggs of birds, taken, transported, or possessed contrary to the provisions of this chapter, or rule or regulation of the department shall be seized by any persons designated in § 150 of this chapter. Upon conviction of the offender or upon judgment of the court having jurisdiction that the item was taken, transported, or possessed in violation of this chapter or rule or regulation of the department, all fish and game, or parts of them are forfeited to the state and shall be disposed of as directed by the court. If sold, the proceeds of the sale shall be transmitted to the proper state officer for deposit in the general fund. Guns, traps, nets, fishing tackle, boats, aircraft, or other vehicles, sleds, or other paraphernalia seized under the provisions of this chapter, or rule or regulation of the department, unless forfeited by order of the court, shall be returned, after completion of the case and payment of the fine, if any.
AS 16.05.195 provides in pertinent part:
*Forfeiture of equipment.* (a) Guns, traps, nets, fishing gear, vessels, aircraft, other mo-

tor vehicles, sleds, and other paraphernalia or gear used in or in aid of a violation of this title, or regulation promulgated under this title, and all fish and game or parts of fish and game or nests or eggs of birds, taken, transported or possessed contrary to the provisions of this title, or regulation promulgated under it, may be forfeited to the state

(1) upon conviction of the offender in a criminal proceeding of a violation of this title in a court of competent jurisdiction; or

(2) upon judgment of a court of competent jurisdiction in a proceeding in rem that an item specified above was used in or in aid of a violation of this title or a regulation promulgated under it.

(b) Items specified in (a) of this section may be forfeited under this forfeiture action.

(c) An action for forfeiture under this section may be joined with an alternative action for damages brought by the state to recover damages for the value of fish and game or parts of them or nests or eggs of birds taken, transported or possessed contrary to the provisions of this title or a regulation promulgated under it.

(d) It is no defense that the person who had the item specified in (a) of this section in possession at the time of its use and seizure has not been convicted or acquitted in a criminal proceeding resulting from or arising out of its use.

seized. The state subsequently filed a complaint for forfeiture which in its final amended form alleged the following specific violations: taking or possessing king crab out of season as defined by 5 AAC 34.610 [2] and Westward Region Emergency Shellfish Orders No. 20 and 23,[3] and prohibited by 5 AAC 34.098,[4] 5 AAC 34.090(a) [5] and AS 16.10.200 [6] on or about January 7, 1976, and taking or possessing king crab out of season in violation of 5 AAC 34.090(c),[7] and AS 16.10.210.[8] The vessel was later released for local fishing pursuant to a stipulated order of the parties dated February 10, 1976, in exchange for the posting of a bond by the owners in the amount of $350,000. Trial in this matter was held in the superior court at Kodiak. The court's final order directed forfeiture of the crab sale proceeds and the bond posted for the release of the vessel.

This appeal has been brought by the owners of the vessel, Harold Hansen, Severin Hjelle, and Reidar Tynes, all residents of Washington. The owners allege (1) the

2. 5 AAC 34.610 provides:

*FISHING SEASONS.* King crab may be taken as follows:

(1) from 12:00 noon September 10 through February 15 unless closed earlier by emergency order, king crab six and one–half inches (165 mm) or greater in width of shell may be taken or possessed;

(2) during periods to be opened and closed by emergency order, king crab seven and one–half inches (191 mm) or greater in width of shell may be taken or possessed.

3. Westward Region Emergency Shellfish Order No. 20, dated November 4, 1975, reads in pertinent part:

The present level of catch and rate of fishing success indicate that the desired king crab catch for the Egg Island district of statistical area O will be attained by 12:00 noon November 7.

The same analysis of data for the Bering Sea (statistical area Q) king crab fishery indicates that the desired harvest of red king crab will be attained by 12:00 noon November 14.

Therefore the Egg Island district of area O will close to king crab fishing after 12:00 noon November 7 and the Bering Sea will close to fishing for red king crab after 12:00 noon November 14.

Westward Region Emergency Shellfish Order No. 23, dated November 18, 1975, reads in part:

*EMERGENCY ORDER:*

5 AAC 34.610. FISHING SEASONS. and 5 AAC 34.635. CLOSED WATERS. and 5 AAC 34.535 CLOSED WATERS. shall be amended to read as follows:

5 AAC 34.610. FISHING SEASONS. King crab may be taken or possessed from 12:00 noon November 1 through February 15 unless the registration area is closed earlier by emergency order.

5 AAC 34.635. CLOSED WATERS. King crab fishing is prohibited:

(a) after 12:00 noon November 7 in the Egg Island district . . . .

4. 5 AAC 34.098 provides:

*VIOLATION OF REGULATIONS.* It is unlawful for any person to violate any of the regulations of this chapter.

5. 5 AAC 34.090(a) provides:

*UNLAWFUL POSSESSION OF KING CRAB OR KING CRAB GEAR.* (a) It is unlawful for any person to possess unprocessed king crab aboard a vessel licensed as a commercial fishing vessel within any registration area unless the vessel is validly registered for the area and the season is open, or unless the person is acting pursuant to the authorization of sec. 30(d), sec. 33, or sec. 35(e) of this chapter.

6. AS 16.10.200 provides:

*Unlawful taking prohibited.* It is unlawful for a person taking migratory fish and migratory shellfish in high sea areas designated by the Board of Fisheries or in violation of the regulations promulgated by the Board of Fisheries governing the taking of migratory fish and migratory shellfish in the designated areas to possess, sell, offer to sell, barter, offer to barter, give or transport in the state, including the waters of the state, migratory fish or migratory shellfish.

7. 5 AAC 34.090(c) provides:

(c) It is unlawful for any person to possess, purchase, sell, barter, or transport king crab within the state or within waters subject to the jurisdiction of the state if that person knows or has reason to know that such king crab were taken or possessed in contravention of the regulations of this chapter.

8. AS 16.10.210 provides:

*Unlawful sale or offer prohibited.* It is unlawful for a person to possess, purchase, offer to purchase, sell, or offer to sell in the state migratory fish or migratory shellfish taken on the high seas knowing that they were taken in violation of a regulation promulgated by the Board of Fisheries governing the taking of migratory fish or migratory shellfish in certain areas designated by the Board of Fisheries or the commissioner.

state had no jurisdiction to regulate the fishing activities of the vessel beyond the three–mile Alaska territorial waters limit; (2) the regulations which the vessel was alleged to have violated are unconstitutionally vague; (3) the absence of an in rem procedure and a prompt post–service hearing denied the owners due process of law; (4) the trial court erred in admitting statistical evidence relating to crab migration and size; and (5) the trial court erred in awarding attorney's fees to the state.

The state has brought a cross–appeal, alleging that the trial court erred in allowing the owners of the vessel to substitute the $350,000 bond in lieu of forfeiting the vessel. We find no merit in either appeal, and affirm the lower court's ruling.

I. Jurisdiction over the vessel's fishing activities in waters beyond Alaska's three–mile territorial limit.

 There is some dispute over whether the American Eagle was operating within

or beyond the three–mile territorial limit of state waters when the regulations were allegedly violated.[9] However, assuming the operations were beyond the three–mile limit, we conclude that the state possesses valid authority to regulate crab fishing in these waters. This precise question was decided in *State v. Bundrant*, 546 P.2d 530 (Alaska), *appeal dismissed sub nom. Uri v. State*, 429 U.S. 806, 97 S.Ct. 40, 50 L.Ed.2d 66 (1976), a decision published one week after the American Eagle allegedly violated the law. In *Bundrant* we upheld the state's exercise of regulatory jurisdiction over crab fisheries beyond the three–mile limit against arguments based on federal exclusivity, preemption, and other doctrines.[10] This power to regulate beyond the territorial boundary, where the crab spend much of their life cycle, was shown in that case to be clearly necessary if the economically and ecologically important migratory crab population within the state's territorial bound-

**9.** Testimony at trial showed that on January 2 and January 5 witnesses saw the F/V American Eagle fishing within the closed Egg Island district of king crab statistical area O. On January 7, 1976, Fish and Wildlife officers chartered a vessel and proceeded to the Egg Island district. There they found eight sets of buoys identified as from the F/V American Eagle. One of these pots was pulled. It was baited and contained crabs. On January 16, 27 buoys and traps belonging to the vessel were identified south of Akutan Island in the Egg Island district, seven of which matched numbers of the buoys found on January 7. Alaska's territorial waters are defined in 5 AAC 39.975(13):

(13) "waters of Alaska" means the waters north and west of the International Boundary at Dixon Entrance including those extending three miles seaward

(A) from the coast;

(B) from lines extending from headland to headland across all bays, inlets, straits, passes, sounds and entrances;

(C) from an island or group of islands, including the islands of the Alexander Archipelago, and the waters between the groups of islands and the mainland.

The state, relying on an exhibit in the form of a map which depicts roughly the activity of the American Eagle within the Egg Island district during the 1975–76 season and the location of the buoys, maintains that the violations alleged

occurred within three miles of lines extending between headlands or within three miles of groups of islands in the district. However, a state protection officer testified that the pots were found within a circle six and one–half miles in diameter, and the state at trial did not attempt to show the location of the alleged violations with more specificity.

**10.** After our decision in *Bundrant v. State*, 546 P.2d 530 (Alaska 1976), Congress enacted the Fishery Conservation and Management Act of 1976 (FCMA), which provides for federal fisheries management in areas seaward of Alaska's three–mile maritime boundary to a distance of 200 miles. Pub.L.No.94–265, 90 Stat. 331 (1976), as amended, codified at 16 U.S.C.A. §§ 1801–82 (West, 1979 Supp.). To the extent that there may be a conflict between state fisheries regulations and federal regulations promulgated under the Act, Alaska's authority to regulate fisheries under *Bundrant* has been superseded. *See* 16 U.S.C.A. § 1856 (West, 1979 Supp.) (delineating federal and state jurisdiction in this area). Nevertheless, the events in this case arose prior to the March 1, 1977, effective date of the FCMA and there were no federal regulations applicable to the taking of king crab by domestic vessels in effect at the time. Consequently, we have relied on *Bundrant.*

ary is to be perpetuated. 546 P.2d at 557.[11] Although some of the specific statutes and regulations questioned in this case differ from those discussed in *Bundrant*, both cases involve challenges by fishermen who reside in another state to Alaska laws which prohibit the taking or possession of king crab outside the territorial limit of state waters, or the subsequent transport and sale of crab within Alaska waters.[12] We therefore reaffirm *Bundrant*, as applied to this case.

II. Unconstitutional vagueness of the regulations applied to the F/V American Eagle.

 A statute or regulation is impermissibly vague when the "language is so indefinite that the perimeters of the prohibited zone of conduct are unclear," violating rights to due process because the law fails to give adequate notice of what type of conduct is prohibited. *Marks v. City of Anchorage*, 500 P.2d 644, 646 (Alaska 1972). The owners of the American Eagle argue that the regulations which the vessel was accused of violating are unconstitutionally vague because they fail to identify with certainty the area subject to regulation by the state which was closed to king crab fishing at the time of the alleged violations.

Some ambiguity did exist in the applicable regulations, as a result of conflict over the extent of the state's jurisdictional power. In 1968 the Alaska Board of Fish and Game had adopted 5 AAC 36.040, making it unlawful to transport, possess, buy or sell any king crab "taken in violation of the rules and regulations promulgated by the board," if such crab was taken "in any waters seaward of that officially designated as the territorial waters of Alaska ...." *Hjelle v. Brooks*, 377 F.Supp. 430, 433 (D.C. Alaska 1974); *State v. Bundrant*, 546 P.2d 530, 533 (Alaska 1976). In 1974, crab fishermen were successful in obtaining a preliminary injunction against the enforcement of this regulation from the federal district court in Alaska. The three–judge panel held that the evidence before the court at that time did not prove a sufficient basis for an extraterritorial regulation applicable only to crab taken beyond the three–mile limit, but confirmed that Alaska could regulate king crab fishing beyond the three–mile boundary if regulations related to a "nexus between its legitimate state interests and its regulation of certain extraterritorial conduct, *Hjelle v. Brooks*, 377 F.Supp. at 441.[13]

---

11. The California Supreme Court in *People v. Weeren*, 26 Cal.3d 654, 163 Cal.Rptr. 255, 607 P.2d 1279 (1980), *cert. denied*, — U.S. —, 101 S.Ct. 115, 66 L.Ed.2d 45 (1980), found penal jurisdiction over defendants charged with fishing illegally when the commission of the charged offense occurred outside of California's territorial waters:

The United States Supreme Court has held that in matters affecting its legitimate interests a state may regulate the conduct of its citizens upon the high seas where no conflict with federal law is presented. More specifically, the court recognized that a state's interests in preserving nearby fisheries is sufficiently strong to permit such extraterritorial enforcement of its laws enacted for that purpose.

It seems obvious that by adoption and enforcement of its control regulations California seeks to prevent the depletion of a very valuable natural resource. Fish swim. By their very nature they move freely across those arbitrary boundaries which are enacted by governmental entities for official purposes. The commercial and recreational value of California's fisheries are self–evident

and are developed, both quantitatively and in their financial aspects, in the record before us. We have no difficulty in discerning in the preservation of its valuable fish population the requisite state interest for extraterritorial enforcement. Furthermore, the state laws here at issue present no conflict with federal swordfish policies because no federal rules in that field have as yet been promulgated under the FCMA.

*Id.*, 163 Cal.Rptr. at 261–262, 607 P.2d at 1285–86 (citations omitted).

12. *See* notes 2 through 8 *supra* and *State v. Bundrant*, 546 P.2d 530, 535 (Alaska 1976).

13. This language is contained in Judge Wright's majority opinion. Judge Plummer's concurring opinion emphasized that the state bears the burden of proof to establish a nexus for regulating the activity. 377 F.Supp. at 442. Judge Von der Heydt dissented, stating that the evidence before the court was too conflicting to conclude that the plaintiffs were reasonably certain to prevail against Alaska's assertions of an ultimate state interest in regulating crab

In conformity with this decision, the state amended its king crab regulations to the form in existence at the time of the American Eagle's alleged violations. These regulations established statistical areas, each consisting of a "registration area" where state conservation laws would be enforced "to protect and maintain the king crab resources of the state," 5 AAC 34.005(c) and an adjacent "seaward biological influence zone" where the state would collect information for the development of protective regulations to govern "king crab resources inhabiting waters subject to the jurisdiction of the state." 5 AAC 34.005(d). The registration area was defined as "comprised of all waters within the statistical area which are waters subject to the jurisdiction of the state," while the seaward biological influence zone was described as "all waters within the statistical area which are not part of the registration area." 5 AAC 34.005(b). The geographic boundaries of statistical area O, were defined exactly in 5 AAC 34.600. The seaward boundary was designated as the 800–fathom depth contour.[14] The Egg Island district of statistical area O, in which the alleged violations occurred, had its exact boundaries described in 5 AAC 34.605(c).[15] However, nowhere in the regulations was the boundary, if any was intended to exist, between the registration area of statistical area O and the seaward biological influence zone of the same area delineated.

Thus, the seaward boundary of the area in which the state intended to enforce its regulations within each statistical area was left unspecified. The intent, according to the state, was for the boundary to extend within the statistical area as far beyond the three–mile limit as state jurisdiction could be justified in a trial on the merits under the *Hjelle* criteria. The vessel owners argue on the other hand that the only reasonable interpretation of the regulations is that the state intended to regulate only to the three–mile limit, in response to the *Hjelle* decision. If this was the intention, a phrase such as "territorial waters of Alaska" employed in the pre–*Hjelle* and post–*Bundrant* regulations or "waters of Alaska," which defines the state's territorial waters in 5 AAC 39.975(3), would reasonably have been employed, rather than "waters subject to the jurisdiction of the state" utilized in describing the boundary of a registration area in the version of 5 AAC 34.005(b) adopted after *Hjelle*. While we disagree with this interpretation by the owners,[16] the ambiguity in the language employed in the regulations is evident.

Regardless of the ambiguity in delineating the registration area, however, the Emergency Orders issued by the state prior to the American Eagle's activities in the Egg Island district left little question that the entire district was closed to king crab fishing as of November 7, 1975. Authorized by AS 16.05.060, Emergency Closure Orders have the force and effect of law.[17] Al-

fishing beyond the territorial limit, and further stating that evidence of the effect of extra–territorial fishing on the crab population and local industry should be considered in assessing the validity of the regulation.

**14.** 5 AAC 34.600 reads:
*Description of Statistical Area.*
Statistical area O has as its eastern boundary the longitude of Scotch Cap light, and as its western boundary 172 degrees W. long., and its seaward boundaries the 800–fathom depth contour, excluding the waters of statistical area Q.

**15.** 5 AAC 34.605(c) states in full:
*Description of Districts.*

. . . . .

(c) Egg Island district: all Pacific Ocean waters of statistical area O east of the longi-

tude of Udagak Strait on Unalaska Island (166 degrees 15 minutes W. long.), south of a line from Erskine Point on Unalaska Is. (53 degrees 59 minutes N. Lat., 166 degrees 16 minutes 45 seconds W. long.) to Jackass Point on Akun Island (54 degrees 06 minutes 35 seconds N. lat., 165 degrees 34 minutes W. long.) then to Avatanak Point (54 degrees 02 minutes 30 seconds N. lat., 165 degrees 17 minutes W. long.), and west of the longitude of Avatanak Point (165 degrees 17 minutes W. long.) including the waters of Beaver Inlet and Udagak Strait.

**16.** *See* note 9 *supra*.

**17.** AS 16.05.060 states:
*Emergency Openings and Closures*
This chapter does not limit the power of the commissioner or his authorized designee,

though 5 AAC 34.035 specifically authorizes the closure of registration areas, neither its terms nor those of AS 16.05.060 prohibit the closure of an entire statistical area or district thereof.[18] Westward Region 1975 Shellfish Emergency Orders Nos. 20 and 23 state unequivocally that the Egg Island district would close to king crab fishing at noon on November 7, 1975.[19] The boundaries of the Egg Island district, as already stated, are described without ambiguity in 5 AAC 34.605(c) as comprising "all Pacific Ocean waters of statistical area O" within specified geographic lines.[20] Emergency Order No. 28, dated November 18, 1975, in no way contradicted the earlier orders. Its text states that "[t]hree districts remain open," of which none of those listed was the Egg Island district. Finally, Emergency Order No. 32, dated January 11, 1976, stated that several previously issued emergency orders, including Nos. 20, 23, and 28 "are rescinded effective immediately" because

"no longer needed." The order states that the rescission is effective only prospectively.[21] Thus the order cannot be interpreted to retroactively authorize crab fishing in the closed Egg Island district such as the American Eagle was alleged to have conducted, and which occurred prior to the effective date of the rescinding order.

We therefore conclude that the closure of the Egg Island district by Emergency Order was not "in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application," in violation of the due process rights of the American Eagle's owners. *Stock v. State*, 526 P.2d 3, 8 (Alaska 1974). Since the other regulations in question have been amended to eliminate the ambiguities noted in this opinion, after *Bundrant* clarified the extra–territorial jurisdiction question in favor of the state, there is no need to further

when circumstances require, to summarily open or close seasons or areas or to change weekly closed periods on fish or game by means of emergency orders. An emergency order has the force and effect of law after field announcement by the commissioner or his authorized designee. An emergency order adopted under this section is not subject to the Administrative Procedure Act.

**18.** *See* note 5 *supra*. 5 AAC 34.035 provides in part:

*Closure of Registration Areas*

(a) The commissioner shall monitor the condition of king crab stocks in all statistical areas through the use of such data and information as are practically available.

(b) When the commissioner finds that continued fishing effort would jeopardize the viability of king crab within a registration area, he shall close the registration area by emergency order.

(c) In determining whether to close a registration area, the commissioner shall consider all appropriate factors to the extent there is information available on such factors. Factors which may be considered include:

(1) the effect of overall fishing effort within the statistical area encompassing the registration area;

(2) catch per unit of effort and rate of harvest;

(3) relative abundance of king crab within the area in comparison with preseason expectations of the department;

(4) such guideline harvest levels as may be promulgated by regulation;

(5) the proportion of immature or softshell king crab being handled;

(6) general information on the condition of king crab within the area; and

(7) information pertaining to the maximum sustainable yield level of king crab within the registration area.

5 AAC 34.610 provides:

*FISHING SEASONS.* King crab may be taken or possessed from 12:00 noon November 1 through February 15 unless the registration area is closed earlier by emergency order.

**19.** *See* note 3 *supra*.

**20.** *See* note 15 *supra*.

**21.** Emergency Order No. 32 reads:

WESTWARD REGION 1975 SHELLFISH FIELD EMERGENCY ORDER NO. 32

*JUSTIFICATION*:

Westward Region 1975 Shellfish Field Emergency Orders No. 1–31 were issued during the year to regulate the shellfish fisheries of the Westward Region. These remain in effect until rescinded. Some of those are no longer needed whereas others must remain in effect for a time. Therefore, the following emergency order is adopted effective January 11, 1976.

*EMERGENCY ORDER*:

Westward Region 1975 Shellfish Field Emergency Orders No. 1 through 6 (including 3A) and 8 through 29 (including 17A) are rescinded effective *immediately* and No. 30 and 31 are rescinded effective *March 1, 1976.*

comment on any deficiencies existing in the past.[22]

### III. Denial of due process of law in the seizure of the vessel.

The owners of the American Eagle also complain they were denied due process of law in that the forfeiture statutes under which the vessel, gear, and sale proceeds were seized provide for no in rem procedure or prompt post–seizure notice and hearing.[23] Given this broad deficiency, the owners, in our opinion, have raised a substantial question whether the statutory scheme on its face affords adequate procedural due process. The standards of due process under the Alaska and federal constitutions require that a deprivation of property be accompanied by notice and opportunity for hearing at a meaningful time to minimize possible injury. *Etheredge v. Bradley*, 502 P.2d 146 (Alaska 1972). Where property allegedly used in an illicit act is confiscated by government officials pending a forfeiture action, no notice or hearing is necessary prior to the seizure. *Calero–Toledo v. Pearson Yacht Leasing Co.*, 416 U.S. 663, 94 S.Ct. 2080, 40 L.Ed.2d 452 (1974). However, when the seized property is used by its owner in earning a

---

**22.** The applicable regulations now provide (emphasis added):

5 AAC 34.005. STATISTICAL AREAS ESTABLISHED.

. . . . .

(b) *Each statistical area consists of*

(1) *a registration area*, comprised of all the waters within the statistical area which are *territorial waters of Alaska*; and

(2) *an adjacent seaward biological influence zone*, comprised of all the waters within the statistical area which are not part of the registration area.

(c) Registration areas are areas in which the department shall apply conservation and management regulations in order to protect and maintain the king crab resources of the state.

(d) Adjacent seaward biological influence zones are areas which the department shall utilize to obtain biological and fishing effort data and other information necessary for the formulation of comprehensive and effective conservation and management regulations governing king crab resources inhabiting the registration area. However, *regulations governing the registration area will also be applied in the adjacent seaward biological influence zone* consistent with sec. 10 of this chapter.

5 AAC 34.010. APPLICATION OF REGULATIONS.

(a) Notwithstanding any other provision of this chapter, *all regulations* in this chapter *applicable to a registration area shall be applicable also in its adjacent seaward biological influence zone.*

(b) *Persons* on a vessel navigating *within an adjacent seaward biological influence zone shall conduct their operations* and activities *in full compliance with the regulations applicable to the appurtenant registration area.*

(c) The commissioner may suspend the application of this section wholly or partially in any seaward biological influence zone if he finds that such application:

(1) does not tend to facilitate enforcement of regulations applicable to a registration area;

(2) does not tend to protect or conserve king crab inhabiting territorial waters of Alaska; or

(3) that the state has an insufficient interest in the king crab inhabiting the zone to warrant extension of the jurisdiction of the state to the zone.

5 AAC 34.035. CLOSURE OF REGISTRATION AREAS.

(a) The commissioner shall monitor the condition of king crab stocks in all statistical areas through use of such data and information as are practically available.

(b) When the commissioner finds that continued fishing effort would jeopardize the viability of king crab within a registration area, he shall close the registration area by emergency order.

. . . . .

(f) The *foregoing provisions* of this section are *applicable* also to closures of districts, subdistricts, sections, or any other portion of a *statistical area.*

5 AAC 34.091. *UNLAWFUL ACTS WITHIN AN ADJACENT SEAWARD BIOLOGICAL INFLUENCE ZONE.* It is unlawful for any person [to take king crab or do other acts] ... in violation of sec. 010(b) of this chapter.

5 AAC 34.610. FISHING SEASONS. King crab may be taken as follows:

(1) from 12:00 non, September 15 through February 15 or until closed by emergency order, king crab six and one–half inches (165 mm) or greater in width of shell may be taken or possessed;

(2) during periods to be opened and closed by emergency order, king crab seven and one–half inches (191 mm) or greater in width of shell may be taken or possessed.

**23.** *See* note 1 *supra.*

livelihood, notice and an unconditioned opportunity to contest the state's reasons for seizing the property must follow the seizure within days, if not hours, to satisfy due process guarantees even where the government interest in the seizure is urgent. *Stypmann v. City and County of San Francisco*, 557 F.2d 1338 (9th Cir. 1977); *Lee v. Thorton*, 538 F.2d 27 (2d Cir. 1976).

■ We need not reach the question of the constitutionality of the statutes in question in this case, however, because it is apparent that the vessel owners were in fact afforded procedural due process. *Jennings v. Mahoney*, 404 U.S. 25, 92 S.Ct. 180, 30 L.Ed.2d 146 (1971); *Wiren v. Eide*, 542 F.2d 757 (9th Cir. 1976).[24] The seizure of the American Eagle and other property of its owners was pursuant to a judicially approved warrant issued under Alaska Rule of Criminal Procedure 37.[25] Under this rule's requirements, one of the owners on board the vessel at the time of the seizure was formally notified then of the state's action. The other owners indicated that they in fact received timely notice of the seizure, for prior to the state's filing of a formal civil complaint for forfeiture thirteen days after the vessel was seized, their attorneys mentioned the possibility of suing for release of the vessel. The owners had an immediate and unqualified right to contest the state's justification for the seizure before a judge under Criminal Rule 37(c).[26] Rather than avail themselves of this opportunity, the owners negotiated the release of the vessel and its gear to local fishing by entering into a voluntary stipulation of a

---

**24.** *Wiren* acknowledged the old line of United States Supreme Court authority on which the vessel owners rely for the proposition that due process provided as a matter of grace or in court rules does not deprive a litigant of his standing to challenge the failure to require specific procedures in the applicable statute itself. 542 F.2d at 762. *See Wuchter v. Pizzutti*, 276 U.S. 13, 48 S.Ct. 259, 72 L.Ed. 446 (1928); *Coe v. Armour Fertilizer Works*, 237 U.S. 413, 35 S.Ct. 625, 59 L.Ed. 1027 (1915); *Central of Georgia Ry. Co. v. Wright*, 207 U.S. 127, 28 S.Ct. 47, 52 L.Ed. 134 (1907); *Security Trust and Safety Vault Co. v. Lexington*, 203 U.S. 323, 27 S.Ct. 87, 51 L.Ed. 204 (1906); *People v. Broad*, 216 Cal. 1, 12 P.2d 941, *cert. denied sub nom. People v. General Motors Acceptance Corp.*, 287 U.S. 661, 53 S.Ct. 220, 77 L.Ed. 570 (1932). *Wiren* explained that these past decisions must be read in light of the Supreme Court's more recent self–imposed rules of restraint in deciding constitutional questions. 542 F.2d at 762. *See United States v. Raines*, 362 U.S. 17, 80 S.Ct. 519, 4 L.Ed.2d 524 (1960). *Jennings* was not discussed in *Wiren*, but held that a person whose driver's license was summarily suspended by an administrative agency could not challenge the validity of the applicable statute, even though the statute's constitutionality presented a "substantial question," where the license suspension had been stayed pending completion of judicial review.

**25.** The quasi–criminal nature of forfeiture proceedings under AS 16.05.190–.195 has been recognized by this court in *Graybill v. State*, 545 P.2d 629, 631 (Alaska 1976). Alaska R.Crim.P. 37 provides in part:

(b) *Execution and Return With Inventory.* The warrant shall be executed and returned within 10 days after its date. The officer taking property under the warrant

(1) shall give to the person from whom or from whose premises the property was taken a copy of the warrant, a copy of the supporting affidavits, and receipt for the property taken, or

(2) shall leave the copies and the receipt at the place from which the property was taken. The return shall be made promptly and shall be accompanied by a written inventory of any property taken as a result of the search pursuant to or in conjunction with the warrant. The inventory shall be made in the presence of the applicant for the warrant and the person from whose possession or premises the property was taken, if they are present, or in the presence of at least one credible person other than the applicant for the warrant or the person from whose possession or premises the property was taken, and shall be signed by the officer under the penalty of perjury pursuant to AS 09.65.012. The judge or magistrate shall upon request deliver a copy of the inventory to the person from whom or from whose premises the property was taken and to the applicant for the warrant.

(c) *Motion for Return of Property and to Suppress Evidence.*
A person aggrieved by an unlawful search and seizure may move the court in the judicial district in which the property was seized or the court in which the property may be used for the return of the property and to suppress for use as evidence anything so obtained on the ground that the property was illegally seized.

**26.** *See* note 25 *supra.*

bond with the state; the parties also agreed to have the seized crab sale proceeds placed in an interest–bearing account pending completion of the suit for forfeiture.

We find no merit in the owners' apparent claim that due process requires that any owner of a vessel seized by the state for suspected use in illegal activity has an absolute right to obtain release of the property upon the posting of an adequate bond. To permit this would frustrate one purpose of forfeitures, which is to prevent possible use of the property in further illicit acts. *Calero–Toledo v. Pearson Yacht Leasing Co.*, 416 U.S. 663, 687, 94 S.Ct. 2080, 2094, 40 L.Ed.2d 452, 470 (1974). While *Calero–Toledo* suggests that due process may require owners of seized property to have a right to its return when they can show they were not aware of or negligent in allowing illegal use of the property,[27] none of the owners appealing the seizure here have demonstrated that they are completely innocent third parties. Unlike the claimants held entitled to relief from forfeiture in the cases cited by the owners, the three owners of the American Eagle are all active partners in the business enterprise of operating the vessel.[28] They share the profits and risk of loss from its fishing activity. Hjelle skippered another crab–fishing vessel in the

Egg Island area while it was open during the season in question, and was one of the named plaintiffs in the *Hjelle* suit over the jurisdictional authority of the state to regulate crab fishing. Hansen was responsible for keeping records of the American Eagle's operating expenses. Under such circumstances, it is not unduly oppressive to charge Hjelle and Hansen with knowledge and control of the American Eagle's activity, even though they were not on board at the time of the alleged infractions as was co–owner Tynes.

IV. Error in the forfeiture of the bond and sale proceeds ordered by the superior court.

A. Forfeiture of the bond in lieu of the vessel, and failure to order an increase in the bond.

■ The state in its cross–appeal argues that the superior court erred in allowing the owners of the American Eagle to forfeit the $350,000 bond they posted, rather than requiring the forfeiture of the vessel itself, or ordering an increase in the value of the bond to reflect a rise in the vessel's appraised value subsequent to the stipulation whereby the vessel was released.[29] The

27. In *Calero–Toledo*, the United States Supreme Court upheld the forfeiture of a yacht used to illegally transport marijuana against a claim by its owners for its return, even though the owners had leased the yacht to the persons committing the crime without knowledge that the vessel would be so used. The opinion stated, however:

> [I]t would be difficult to reject the constitutional claim of an owner whose property had been taken from him without his privity or consent .... Similarly, the same might be said of an owner who proved not only that he was uninvolved in and unaware of the wrongful activity, but also that he had done all that could reasonably be expected to prevent the proscribed use of the property; for in that circumstance, it would be difficult to conclude that forfeiture served legitimate purposes and was not unduly oppressive. 416 U.S. at 689–90, 94 S.Ct. at 2094–2095, 40 L.Ed.2d at 471–72 (citations and footnotes omitted).

28. Cf. *United States v. One 1972 Chevrolet Blazer*, 563 F.2d 1386 (9th Cir. 1977) (case remanded for full evidentiary hearing where

court summarily denied a petition for remission under federal forfeiture statute; owner of car alleged he had not known of or condoned the illegal carrying of a gun silencer in the vehicle by his father, and government had not alleged negligence by the owner); *United States v. One Mercury Cougar XR7*, 397 F.Supp. 1325 (C.D. Cal.1975) (owner loaned her car to boyfriend to pick up passenger at airport and the car was seized when the boyfriend and passenger were arrested for sale of heroin; held violative of due process not to return the car to the owner where record showed she had no awareness of the car's possible illegal use and had done all which reasonably could be expected to prevent the illegal use).

29. The appraised value of the vessel has apparently increased to approximately $1.3 to $1.5 million, including a federal government mortgage in addition to the equity interest of the appellants.

state contends particularly that the superior court erred in relying on the general rules of admiralty law in holding that the stipulated bond served as a complete substitute for the res, thereby limiting the state's recovery to that bond, rather than a form of bail in order to allow for the temporary release of the vessel only. We hold that no error was committed by the superior court in this regard.

We look first to the language of the stipulation of February 10, 1976, to resolve this question. We must conclude that by itself the stipulation is ambiguous. The document identifies the vessel and gear as part of the res in the forfeiture action, and requires the owners, "on an order of a court of competent jurisdiction," to deliver the vessel and gear to the Port of Kodiak. It requires the owners to "technically seize" crab pots belonging to the vessel and stored in Alaska waters, acting as "agents" of the state. These provisions indicate an intent by the state to obtain rights to the vessel. However, the document also states that *"said release [is] to be final* with no right by claimants to return said vessel and relieve themselves of the conditions thereof until a final judgment of this or an appellate court is entered" (emphasis added) and includes as a reason for release "that the vessel may locally fish," indicating the state's lack of interest in preventing further use of the vessel by its owners.[30]

---

**30.** The stipulation reads:

STIPULATION

WHEREAS, the State of Alaska is preparing to file a civil complaint for forfeiture and damages in the above–entitled matter (copy attached) and;

WHEREAS, the filing of this forfeiture complaint according to some authorities must be preceded by seizure of the res and;

WHEREAS, part of the res in this case is the fishing vessel American Eagle, a steel–hulled vessel with all her own boat gear valued at approximately $350,000 and;

WHEREAS, this vessel is presently in the custody of the State of Alaska having been seized pursuant to the warrant for search and seizure and;

WHEREAS, part of the res in this case is the number of king crab pots now located near Juneau in Alaska waters and;

WHEREAS, it is agreeable to restore the vessel to claimant so that the vessel may locally fish and collect her crab gear,

IT IS AGREED AND STIPULATED as follows:

1. William B. Rozell of Faulkner, Banfield, Doogan & Holmes will enter his appearance for defendants named herein and waive formal service of process of this complaint.

2. That Harold P. Hansen, Hjelle Enterprises, Inc. and Tynes Enterprises, Inc., Seattle, Washington, by and through counsel William B. Rozell do hereby enter their claim as their interests may appear, to the res to be forfeited in this complaint.

3. That Harold P. Hansen, Hjelle Enterprises, Inc. and Tynes Enterprises, Inc. do hereby agree to retake care, custody and control of the vessel from the State and to hold the State harmless as for any damage which may occur after the time of possession is retaken.

4. That Harold P. Hansen, Hjelle Enterprises, Inc. and Tynes Enterprises, Inc. do hereby agree to act as agent for the State, technically seizing the crab pots of the American Eagle wherever they may be.

5. That Harold P. Hansen, Hjelle Enterprises, Inc. and Tynes Enterprises, Inc. further agree to waive any and all requirements that the State seize said crab pots.

6. That Harold P. Hansen, Hjelle Enterprises, Inc. and Tynes Enterprises, Inc. further agree to execute a promissory note (copy attached) to the State secured by a preferred ship mortgage (copy attached) and to secure endorsement of the policy of insurance on the vessel to the State of Alaska as their interest may appear in the amount of the appraised value of the vessel, unless insurance in this amount is unavailable then in the amount of insurance that can be obtained commercially, keeping said policy in full force and effect for the vessel's full value until relieved by order of this or an appellate court.

7. That Harold P. Hansen, Hjelle Enterprises, Inc. and Tynes Enterprises, Inc. further agree not to remove said vessel and crab pots permanently from the United States or on an order of a court of competent jurisdiction to deliver said vessel and crab pots to the Port of Kodiak in as good a condition as when seized, normal wear and tear excepted.

8. That plaintiff State of Alaska agrees that simultaneously with the filing of the complaint herein that it will move the Superior Court for release of said vessel to claimants subject to the conditions expressed in this Stipulation, said release to be final with no right by claimants to return said vessel and relieve themselves of the conditions thereof until a final judgment of this or an appellate court is entered.

The promissory note for $350,000 executed by the owners as required by the stipulation contains equally ambiguous language, providing "[t]he undersigned promises to pay the State of Alaska the sum of any fine for forfeiture assessed the vessel American Eagle by a court of competent jurisdiction . . ." and "in the event that the American Eagle is delivered to a port within the State of Alaska . . . [t]his note shall be null and void," but that "[t]he amount due under this note shall not exceed $350,-000" and "[t]his note is executed solely for the purpose of providing security to the State of Alaska for any fine or forfeiture which may be assessed . . . ."[31] The stipulation agreement requires the owners to secure insurance on the vessel "in the amount of the appraised value of the vessel" and the promissory note requires the proceeds of the insurance to be tendered to the state in case of loss of the vessel. However, the stipulation agreement recites that the vessel and its gear at the time of the stipulation were "valued at approximately $350,000."[32] While these provisions are consistent with an intent by the state to retain sufficient security to ensure the return of the vessel itself upon judgment, they also may be interpreted as an understanding between the parties that the bond and insurance provisions would completely satisfy the state's interest in exacting a penalty from the vessel owners if forfeiture was ordered. The state's willingness to release the vessel so that it could continue to be used in local fishing could indicate a lack of resources for storing and maintaining the vessel as well as a decision that the vessel was unlikely to be used in further

---

DATED in Anchorage this _____ day of February, 1976.

AVRUM M. GROSS
ATTORNEY GENERAL

By: _____
Gerald W. Markham
Assistant Attorney General

FAULKNER, BANFIELD, DOOGAN & HOLMES

_____
William B. Rozell
of Attorneys for Defendants

*ORDER*

IT IS ORDERED that the vessel American Eagle presently under seizure be released to the care, custody and control of defendant/claimants subject to the terms expressed in the Stipulation.

DATED this _____ day of February, 1976.

_____
Superior Court Judge

**31.** The note reads in full:

*PROMISSORY NOTE*

The undersigned promises to pay the State of Alaska the sum of any fine or forfeiture assessed the vessel American Eagle by a court of competent jurisdiction arising out of any action now commenced or to be commenced within the next ninety (90) days, arising out of any alleged illegal crabbing activities in which the vessel American Eagle is alleged to have engaged from November 8, 1975 until the present in the State of Alaska and that said fine shall be paid the State of Alaska within thirty (30) days after any final judgment is entered or if appeal is taken therefrom within thirty (30) days after entry of a mandate by the appropriate appellate court. The amount due under this note shall not exceed $350,000.

This note shall not be construed as an admission of any liability or as an admission that the American Eagle's owner, skipper and crew separately or collectively have engaged in any illegal activity; or as an acknowledgement that the seizure of the vessel American Eagle by the State of Alaska was and is a valid and legal action. This note is executed solely for the purpose of providing security to the State of Alaska for any fine or forfeiture which may be assessed by a court of competent jurisdiction.

In the event a fine or forfeiture is not entered against the American Eagle, or in the event that the authority of the State under which the vessel American Eagle was seized is held invalid by a final order of a court or if appeal is taken, after entry of a mandate by the appropriate appellate court, or in the event that the American Eagle is delivered to a port within the State of Alaska and notice of said delivery is given to the office of the Attorney General of Alaska, or in the event the vessel is totally lost or destroyed by fire, sinking or similar accident covered by the hull insurance on the vessel and the undersigned's interest in the proceeds of said hull insurance are tendered to the State of Alaska or deposited with the Clerk of the Superior Court or the Clerk of the United States District Court, then in that event this note shall be null and void and in no further force or effect and the State of Alaska will take all steps necessary to release all its right, title, and interest in the vessel American Eagle.

**32.** *See* notes 30 and 31 *supra*.

violations, but these reasons for release can apply equally to the state's concerns either before or after a forfeiture judgment.

 It was therefore proper for the trial judge to look to relevant case law, absent explicit guidance in the forfeiture statutes, to interpret the stipulation. Federal admiralty cases have uniformly held that stipulation agreements for the value of a vessel generally serve as complete substitutes for the res; once posted, they limit recovery to that amount. *See United States v. Ames*, 99 U.S. 35, 25 L.Ed. 295 (1878); *J. K. Welding v. Gotham Marine Corp.*, 47 F.2d 332 (S.D.N.Y.1931). Such stipulations constitute an agreement with the court, involving substitution of a chose in action against the owner in place of the vessel sued in rem. The bond filed becomes the res which alone is sufficient to give the court in rem jurisdiction. *J.K. Welding Co. v. Gotham Marine Çorp.*, 47 F.2d 332, 334–35 (S.D.N.Y.1931). Under the rules of admiralty, once a stipulation for value is posted with the court, the once–seized vessel is free from re–arrest in the same action. *See The Shreveport*, 42 F.2d 524, 527 (E.D.S.C. 1930). Absent fraud, mistake, or duress, the amount of the stipulation bond will not be raised even though the value of the vessel increases. *United States v. Ames*, 99 U.S. 35, 25 L.Ed. 295 (1878).

 The state complains that the above cases deal with commercial liens operating under established admiralty rules. However, the same rules have been applied as well to a government forfeiture proceeding against a vessel for transporting contraband. *The Ruth*, 20 F.2d 314 (3d Cir. 1927). The state also cites admiralty cases in which courts used their discretion to refuse to release vessels on bond absent a stipulated provision for return of the vessels in case forfeiture was upheld. *See The Seal*, 45 F.2d 243 (S.D.Cal.1929); *United States v. The Memory*, 111 F.Supp. 131 (D.Del.1953). But these cases do not lead to the conclusion that the trial judge here erred in interpreting the ambiguous and conflicting language of the particular stipulation approved in this case as he did. Limiting the owners' forfeiture liability to the amount of the bond, despite a provision in the agreement for the return of the vessel upon order of the court, is consistent with treating the vessel as alternate security for the bond amount to ensure payment of the promissory note. Finally, the state argues that because the trial court's final order of December 1, 1977, decreed forfeiture of the ship and ordered the vessel's return to Kodiak, forfeiture of the vessel itself was the intention of the stipulation. Under admiralty law, however, the court must decree forfeiture against the vessel before final judgment against the substitute bond is entered. *The Ruth*, 20 F.2d 314 (3d Cir. 1927). The superior court's later order requiring substitution of the bond for forfeiture of the vessel is in accord with this rule.

 The same result is indicated in any event under Alaska case law. Although civil in form, forfeiture actions are basically criminal in nature. *Graybill v. State*, 545 P.2d 629, 631 (Alaska 1976). As a general rule, forfeitures are disfavored by the law, and thus forfeiture statutes should be strictly construed against the government. *One Cocktail Glass v. State*, 565 P.2d 1265, 1268–69 (Alaska 1977). The conditions upon which the vessel was voluntarily released by the government are not clear from the stipulation. Furthermore, one of the reasons cited for releasing the vessel, to enable it to return to fishing, is inconsistent with one of the state's justifications for requiring forfeiture of the vessel itself–preventing further illegal fishing. In this context the better interpretation of the agreement is that in favor of the owners of the vessel, against whom this more substantial penalty could be assessed.

### B. Whether forfeiture of the bond was an excessive penalty.

 The owners of the vessel complain, on the other hand, that even forfeiture of the bond was an abuse of the trial court's discretion under AS 16.05.195 to' order forfeiture of all, part, or none of the res. *See One Cocktail Glass v. State*, 565 P.2d 1265, 1271 n.11 (Alaska 1977). They argue that the uncertainty of the law regulating the crab fishery prior to the *Bundrant* decision mitigated the seriousness of the vessel's of-

fenses. Hansen and Hjelle in addition contend they are being unduly penalized because they were not on board the vessel at the time of the alleged infractions.

Yet the owners admit their awareness of the pendency of the *Bundrant* appeal during the 1975–76 season and therefore of the unsettled nature of the jurisdictional question in the courts of this state. We have already concluded that the regulatory scheme in effect gave adequate notice to the vessel's owners of the violations alleged. In this light the stated position of the owners if anything evidences a willingness to deliberately violate existing laws in hopes that they will be declared invalid at a later date. The fact that two of the active partners in the operation of the vessel were not on board when the violations occurred does not relieve them of responsibility for its illegal use, as has already been discussed. The violations alleged involved taking for commercial profit a crucial biological resource of the state, the existence of which depends on careful regulation of harvest. In these circumstances we hold that forfeiture of the bond and crab sale proceeds was not an abuse of the superior court's discretion.

V. Admissibility of certain state evidence.

In addition to witnesses who testified to seeing the American Eagle in the Egg Island district and finding American Eagle crab pots in that district, the state produced several biologists and fish and game officials who testified regarding differentials in the size, weight, and geographical locations of crab species in statistical area O and introduced into evidence a study on the size and migratory habits of king crab in the Unalaska area. The state introduced this evidence in order to show it unlikely that the crabs seized from the American Eagle came from the Western District of area O, where the vessel owners claimed they were caught, essentially by showing that Egg Island district crabs tend to be distinctly smaller than those from the Western District and that the crabs seized from the American Eagle were of the size to be expected from the Egg Island district. The

vessel owners argue that this evidence should not have been admitted as it is statistically unreliable, due to the limited size and location of the samples upon which some of the statistical conclusions were based and due to alterations in the fish tickets upon which conclusions about the average size of crabs from different districts were based. In addition, the owners claim the superior court erred in refusing to admit new evidence obtained after the trial that smaller crabs could be caught in the Western District.

On review by this court, "[a] trial judge will only be reversed for admitting prejudicial, but otherwise relevant, evidence if he has committed a 'clear abuse of discretion.'" *Poulin v. Zartman*, 542 P.2d 251, 260 (Alaska 1975), *citing Davis v. Chism*, 513 P.2d 475, 479 (Alaska 1973). The test of relevancy is whether the evidence has some tendency in reason to establish a proposition material to the case. Alaska R.Evid. 401; *Hutchings v. State*, 518 P.2d 767, 769 (Alaska 1974). If the evidence is relevant, reversal is appropriate only where its prejudical effect so outweighs its probative value that admission constitutes a clear abuse of discretion. *Poulin v. Zartman*, 542 P.2d 251, 260 (Alaska 1975).

In the instant case the testimony, statistical evidence, and fish tickets admitted by the superior court were relevant to the question of where the American Eagle's crabs were likely to have been caught. Both sides presented their arguments before the superior court regarding the reliability of the evidence prior to its admission. Some question was raised regarding the statistical validity and accuracy of the evidence. However, the state also substantiated its claims based on its own sampling of crab populations with samples taken from commercial crab catches and interviews with commercial fishermen. Alteration of the fish tickets, in the form of filling in data such as the number of crabs in a catch and the registration area from which the crabs were taken, was justified by the state as necessary when the fishermen and processors required by law to submit such infor-

mation omitted it. The sources for supplying the omitted information were identified as the fishermen and processors themselves as well as direct measurements of samples from catches and direct observations of vessels. We believe that any deficiencies in the evidence go primarily to its weight rather than its admissibility, and cannot conclude from a review of the record that any of the evidence was sufficiently misleading to outweigh its probative value and render its admission a clear abuse of discretion. Likewise, we conclude that the additional evidence of smaller crabs caught in the Western District does not sufficiently refute the generalizations regarding crab size reached from the other evidence to indicate that the superior court's refusal to consider that evidence was an abuse of discretion.

## VI. Attorney's fees and costs.

 We reject the vessel owners' claim that the award of costs and attorney's fees to the state was in error. The superior court awarded the state $55,000, advancing two reasons for its decision: 1) the award "in the discretion of the Court is a reasonable fee" based upon the precedentsetting, complex nature of the case, and 2) the amount awarded approximated 10% of the value of the total judgment against the owners "but with an additional amount added due to the complexity and novelty of the issues involved." We will interfere with the broad discretion accorded the superior court in awarding attorney's fees only where the award appears to be "manifestly unreasonable." *Alaska Placer Co. v. Lee,* 553 P.2d 54, 63 (Alaska 1976). The award in this case is supported by both Civil Rule 82(a)(1), allowing the court to award the percentage of any money judgment indicated by the statute "[u]nless the court, in its discretion, otherwise directs," and Civil Rule 82(a)(2) providing that the court shall base its award on the "amount and value of legal services rendered" "[i]n actions where the money judgment is not an accurate criteri[on] for determining the. fee."[33] Awarding $55,000 in fees, regardless of its relationship to the judgment against the vessel owners, is not "manifestly unreasonable" in our opinion for complex litigation which extended for over two years.

 The vessel owners claim they should be entitled to the "public interest" exception to the normal award of attorney's fees to the prevailing party. *See Girves v. Kenai Peninsula Borough,* 536 P.2d 1221 (Alaska 1975); *Gilbert v. State,* 526 P.2d 1131 (Alaska 1974). This case is basically a dispute between the state and three individuals, concerning valuable private property seized for violating state laws regulating a commercial enterprise. The substantial economic interest at stake is not of the type which is protected by the "public interest" exception, so we find no merit to this argument by the owners.[34] We find the owners'

---

**33.** Alaska R.Civ.P. 82(a) states:
 (a) *Allowance to Prevailing Party as Costs.*
 (1) Unless the court, in its discretion, otherwise directs, the following schedule of attorney's fees will be adhered to in fixing such fees for the party recovering any money judgment therein, as part of the costs of the action allowed by law:
ATTORNEY'S FEES IN AVERAGE CASES

| | | Contested | Without Trial | Non-Contested |
|---|---|---|---|---|
| First | $2,000 | 25% | 20% | 15% |
| Next | $3,000 | 20% | 15% | 12.5% |
| Next | $5,000 | 15% | 12.5% | 10% |
| Over | $10,000 | 10% | 7.5% | 5% |

 Should no recovery be had, attorney's fees for the prevailing party may be fixed by the court as a part of the costs of the action, in its discretion, in a reasonable amount.

 (2) In actions where the money judgment is not an accurate criteri[on] for determining the fee to be allowed to the prevailing side, the court shall award a fee commensurate with the amount and value of legal services rendered.
 (3) The allowance of attorney's fees by the court in conformance with the foregoing schedule is not to be construed as fixing the fees between attorney and client.

**34.** We faced a similar issue regarding attorney's fees on appeal in *Thomas v. Bailey,* 611 P.2d 536, 539 & n.9 (Alaska 1980):
 In determining the amounts of attorney's fees on appeal in public interest litigation, we believe that the same considerations are applicable as at the trial level. When a sufficient public interest is involved, it is therefore appropriate to award full attorney's fees

other contentions, that an award for attorney's fees above and beyond the res forfeited in the action is barred, and that certain costs granted to the state in addition to the attorney's fees award should not have been allowed, to be equally without merit.[35]

The ruling of the court below is AFFIRMED.

BOOCHEVER, J., not participating.

CONNOR, Justice, dissenting.

I dissent for the same reasons which I stated in my dissenting opinion in *State v. Bundrant*, 546 P.2d 530 (Alaska 1976). See also my dissent in *State v. Sieminski*, 556 P.2d 929, 935 (Alaska 1976).

In my view, the state does not have jurisdiction beyond the three mile limit. This proposition is strengthened by Congress' action in setting up fisheries management controls in the area outward from the three mile limit. Any regulatory activities of the state in the area outside the three mile limit would have to be accomplished under the aegis of federal authority.

on appeal to a successful public interest litigant. At times, such a decision may depend upon a balancing of the public and private interests involved in pressing the litigation.

We have utilized such a balancing test in determining whether attorney's fees should be assessed against an unsuccessful party claiming to have litigated a question of public interest. Where the sums at stake in the controversy are sufficiently large to prompt suit regardless of the public interest, an award of attorney's fees against the losing party has been found reasonable. In such cases, the concern that fear or expense will significantly deter citizens from litigating questions of general interest to the community is inapplicable. Similarly, questions which primarily affect the private rights of the parties before the court lack the requisite public character to prohibit an award, even if some public or constitutional issues are involved.

[citations omitted] [footnote integrated into text].

35. The owners claim that the state should not have been allowed to claim any costs because notice of the date of the hearing on the costs bill was not timely served as required by Alaska R.Civ.P. 79(a). However, the assistant attorney general called the owners' attorney within the ten–day period, offering to set a mutually convenient hearing date, which offer was refused. This is sufficient compliance with Alaska R.Civ.P. 79(a)'s requirement that notice of the hearing date be served "together with" the costs bill within the ten–day period.

The owners also object to the award of costs for plane fare for an out-of-state witness. This cost is explicitly allowed in lieu of in–state mileage by Alaska R.Admin.P. 9(b).