STATE of Alaska, Petitioner,

v.

Wilder S. RICE and Cessna Finance Corporation, Respondents.

CESSNA FINANCE CORPORATION, Cross-Petitioner,

v.

STATE of Alaska, Wilder S. Rice, and United Bank of Alaska, Cross-Respondents.

Nos. 4777, 4778.

Supreme Court of Alaska.

April 10, 1981.

---

**16.** *State v. Chaney*, 477 P.2d 441 (Alaska 1970).

**17.** At the time of the offense AS 11.15.010 provided:

> *First degree murder.* A person who, being of sound memory and discretion, purposely, and either of deliberate and premeditated malice or by means of poison, or in perpetrating or in attempting to perpetrate, rape, arson, robbery, or burglary kills another, is guilty of murder in the first degree, and shall

be sentenced to imprisonment for not less than 20 years to life.

Sarah Elizabeth Fussner, Asst. Atty. Gen., Anchorage, and Avrum M. Gross, Atty. Gen., Juneau, for petitioner/cross-respondent, State of Alaska.

Wilder S. Rice, pro se.

James R. Peterson, Burr, Pease & Kurtz, Inc., Anchorage, for respondent/cross-petitioner, Cessna Finance Corp.

## OPINION

Before RABINOWITZ, C. J., CONNOR, BURKE and MATTHEWS, JJ., and DIMOND, Senior Justice.

RABINOWITZ, Chief Justice.

This petition for review considers important questions concerning mens rea in game regulations and issues of substantive and procedural due process as to security hold-

ers in the forfeiture of equipment for game violations.

Wilder Rice, a big game guide, and two clients of his were arrested and charged with killing a moose in violations of game regulations. More particularly, Rice and his co-defendants were charged with allegedly killing a moose the "same day airborne" in violation of 5 AAC 81.070(b)(6).[1] Rice was also charged with transporting meat taken illegally in violation of 5 AAC 81.140(b).[2] Acquitted on the first charges, Rice was convicted of illegal transportation and sentenced in December 1977 to thirty days in jail, a $500 fine, and forfeiture of a Cessna airplane used in committing the alleged offense.

Rice appealed his conviction to the superior court on several grounds, including contentions that the regulation was void for vagueness and that some form of intent must be implied in the regulation he was convicted of violating. Meanwhile, Cessna Finance, possessing a substantial security interest in the airplane, sought and was granted leave to intervene in the superior court proceedings, to plead violations of substantive and procedural due process in the forfeiture of the airplane without formal notice to it of the sentencing proceeding. The superior court overturned Rice's conviction and vacated the sentence, finding reversible error in the failure of the district court to instruct that the jury must find beyond a reasonable doubt that the defendant knew or should have known the moose meat was illegally taken.[3] The superior court also held that constitutional due process requires "that in order to forfeit a third party's interest in this aircraft or in any other particular item, that notice and an opportunity to be heard must be given." The state then filed the instant petition for review.

Pursuant to AS 16.05.195,[4] the state, on October 16, 1977, also filed a civil action in

1. 5 AAC 81.070(b) provides, in part:

 (b) The illegal methods and means of taking big game . . . are

 . . . .

 (6) a person who has been airborne may not thereafter take or assist in taking big game until after 3:00 a. m. following the day in which the flying occurred . . . .

2. 5 AAC 81.140(b) provides, "No person may possess or transport any game or parts of game illegally taken."

3. Specifically, the superior court stated:

 The court, however, feels that with respect to the question of the instruction as to knowledge under this particular regulation there should have been an instru—by the plain reading of the regulation it would apply to anyone, however innocent or non-innocent they may be with respect to any knowledge they might have had or whatever steps they had gone through to ascertain whether or not the game in question was illegally [taken]. It could apply equally to Wien or any other person and therefore, because of that, the court is reversing the conviction. That this particular regulation, the way it is written, is not void for vagueness when the jury would be instructed that the particular individual involved who is charged with the crime either knew or should have known that the game in question was improperly taken.

4. AS 16.05.195 provides:

 Forfeiture of equipment. (a) Guns, traps, nets, fishing gear, vessels, aircraft, other motor vehicles, sleds, and other paraphernalia or gear used in or in aid of a violation of this title, or regulation promulgated under this title, and all fish and game or parts of fish and game or nests or eggs of birds taken, transported or possessed contrary to the provisions of this title, or regulation promulgated under it, may be forfeited to the state

 (1) upon conviction of the offender in a criminal proceeding of a violation of this title in a court of competent jurisdiction; or

 (2) upon judgment of a court of competent jurisdiction in a proceeding in rem that an item specified above was used in or in aid of a violation of this title or a regulation promulgated under it.

 (b) Items specified in (a) of this section may be forfeited under this section regardless of whether they were seized before instituting the forfeiture action.

 (c) An action for forfeiture under this section may be joined with an alternative action for damages brought by the state to recover damages for the value of fish and game or parts of them or nests or eggs of bird taken, transported or possessed contrary to the provisions of this title or a regulation promulgated under it.

 (d) It is no defense that the person who had the item specified in (a) of this section in possession at the time of its use and seizure has not been convicted or acquitted in a criminal proceeding resulting from or arising out of its use.

the superior court for damages against Rice and Reidt (one of the co-defendants) and for forfeiture of the airplane. On November 18, 1977, the state issued a notice of complaint for forfeiture which was sent to Cessna Finance. Cessna later moved for summary judgment on this action, asking, inter alia, that AS 16.05.195 be held unconstitutional as violating due process. The superior court denied the motion, concluding that there was no denial of substantive due process in the forfeiture proceedings. Cessna petitioned for review of this ruling.

The petitions were granted[5] and the cases consolidated. The first issue that must be considered is whether the superior court erred in requiring an element of mens rea in the offense for which Rice was convicted.

Rice was convicted of violating 5 AAC 81.140(b), which provides: "No person may possess or transport any game or parts of game illegally taken." Rice contended on appeal and the superior court agreed that there is an implied element of intent in this offense, and that the accused must have known, or reasonably should have known, that the game was illegally taken. The state on appeal to this court argues that such an element should not be implied.

During argument on jury instructions before the district court, Rice's counsel brought up the issue of scienter and, after discussion, specifically requested an instruction that in order to convict, the jury "must be satisfied that the person either knew, or reasonably should have known, that the game or parts of game were illegally tak-

en."[6] The district court denied the requested instruction, and Rice was convicted.

This court has several times considered the question of whether a statute, which does not explicitly require criminal intent, implicitly requires it. The general position of the court was recently summarized in *State v. Guest*, 583 P.2d 836, 838 (Alaska 1978) (footnotes omitted):

We recognized in *Speidel v. State*, 460 P.2d 77 (Alaska 1969), that consciousness of wrongdoing is an essential element of penal liability. 'It is said to be a universal rule that an injury can amount to a crime only when inflicted by intention— that conduct cannot be criminal unless it is shown that one charged with criminal conduct had an awareness or consciousness of some wrongdoing.' *Id.* at 78. . . .

Our opinion in *Speidel* stated that there are exceptions to the general requirement of criminal intent which are categorized as 'public welfare' offenses. These exceptions are a rather narrow class of regulation, 'caused primarily by the industrial revolution, out of which grew the necessity of imposing more stringent duties on those connected with particular industries, trades, properties, or activities that affect public health, safety or welfare.' *Speidel v. State, supra* at 78. The penalties for the infraction of these strict liability offenses are usually relatively small and conviction of them carries no great opprobrium. *Id.* at 79.

The question is whether 5 AAC 81.140(b) is a public welfare regulation for which the

(e) No forfeiture may be made of an item subsequently sold to an innocent purchaser in good faith. The burden of proof as to whether the purchaser purchased the item innocently and in good faith shall be on the purchaser.

(f) An item forfeited under this section shall be disposed of at the discretion of the department.

5. Petitions were granted in the criminal case under former Alaska R.App.P. 23(c)(3) and in the civil case under former Alaska R.App.P. 23(d). We concluded that review should be granted pursuant to former Alaska R.App.P. 24(a)(1) since the issues were of such sub-

stance and importance as to warrant deviation from normal appellate procedures.

6. The state argues that the court must consider the question under the plain error standard since "the only instruction discussed in the points on appeal [to the superior court] and in the defendant's brief was a requested instruction that the jury must find beyond a reasonable doubt that the defendant *knew* that the meat he transported was illegally taken." However, the actual transcript reveals that Rice requested an instruction in the form "know or reasonably should know." Therefore, the point was properly raised below, and the state's argument to the contrary is rejected.

omission of any requirement of criminal intent is valid. In *Kimoktoak v. State*, 584 P.2d 25, 31 (Alaska 1978), we stated that such determinations are to be made on a case-by-case basis. It must be remembered that strict liability is an exception to the rule which requires criminal intent. Criminal statutes will be strictly construed to require some degree of mens rea absent a clear legislative intent to the contrary. Even when a statute, or a regulation, does not explicitly require any element of mens rea, we will scrutinize the statute or regulation to determine whether mens rea must be made part of the definition of the particular offense.[7]

Strict liability offenses were originally considered in F. Sayre's classic article, *Public Welfare Offenses*,[8] in which he concluded that these offenses fell into certain limited categories.[9] Among these are "violations of general police regulations."[10] These encompass, as originally proposed by Sayre, fish and game regulations,[11] and a number of fish and game regulations have been upheld on the theory of strict liability.[12] Thus, the mere fact that the case at bar involves a fish and game regulation might perhaps be considered by some to be sufficient to justify characterization of the subject offense as a strict liability offense.

Nevertheless, we think that other concerns must also be considered. Fish and game regulations are not necessarily by their very nature immune from the requirement of mens rea. As we noted in *Kimoktoak v. State*, 584 P.2d 25, 31 (Alaska 1978), a danger of unconstitutionality is a relevant concern in determining whether to construe intent into the regulation:

> Finally, we note that in *Campbell*, we recognized the well-established rule of statutory construction that courts should if possible construe statutes so as to avoid the danger of unconstitutionality. We have alluded to this rule on many other occasions. It recognizes that the legislature, like the courts, is pledged to support the state and federal constitutions and that the courts, therefore, should presume that the legislature sought to act within constitutional limits. 2 Sutherland Statutory Construction, § 4509, at 326 (Horack

---

7. In *State v. Campbell*, 536 P.2d 105 (Alaska 1975), we had implied that the mens rea requirement would only be applied in crimes with common law origins. In *Kimoktoak v. State*, 584 P.2d 25, 31 (Alaska 1978), this court overruled *Campbell* and held that intent under certain circumstances would be read into noncommon law offenses:

> Accordingly, we hold that to the extent that our decision in *Campbell* established the broad rule that criminal intent can be found by implication only in statutes which codify common law crimes, *Campbell* is overruled. Although we can conceive of cases where we may decline to imply such intent into statutes silent in this respect, hereafter we will resolve such questions on a case by case basis.

8. F. Sayre, *Public Welfare Offenses*, 33 Colum. L.Rev. 55 (1933).

9. Sayre grouped the categories as follows:
> (1) Illegal sales of intoxicating liquor;
> (a) sales of prohibited beverage;
> (b) sales to minors;
> (c) sales to habitual drunkards;
> (d) sales to Indians or other prohibited persons;
> (e) sales by methods prohibited by law;
> (2) Sales of impure or adulterated food or drugs;
> (a) sales of adulterated or impure milk;
> (b) sales of adulterated butter or oleomargarine;
> (3) Sales of misbranded articles;
> (4) Violations of anti-narcotic acts;
> (5) Criminal nuisances;
> (a) annoyances or injuries to the public health, safety, repose or comfort;
> (b) obstructions of highway;
> (6) Violations of traffic regulations;
> (7) Violations of motor-vehicle laws;
> (8) Violations of general police regulations, passed for the safety, health or well-being of the community.
> *Id.* at 73 (footnote omitted).

10. *Id.*

11. *Id.* at 87–88.

12. *United States v. Ayo-Gonzalez*, 536 F.2d 652, 662 (5th Cir. 1976) (no intent required for statute prohibiting foreign vessels from fishing within contiguous fishing zone of United States); *United States v. Ardoin*, 431 F.Supp. 493, 495 (W.D.La.1977) (offense of migratory bird hunting with aid of bait as a crime without intent); *State v. Barber*, 91 N.M. 764, 581 P.2d 27, 28–30 (App.1978) (hunting by spotlight requires no criminal intent).

3d Ed. 1943). [footnote and citations omitted]

The wording of the regulation under consideration, 5 AAC 81.140(b), is broad. It provides: "No person may possess or transport any game or parts of game illegally taken." Upon appeal to the superior court, Rice attacked the regulation as being void for vagueness. It is quite apparent from a reading of the transcript of the hearing before the superior court that the court was concerned with the broad applicability of the statute. It noted that, under the statute, if illegally taken game were found on board a commercial aircraft then the commercial airplane would also be subject to forfeiture. The seeming absurdity of the possible seizure of a commercial aircraft for shipping a piece of moose meat that would in no fashion reflect the fact that the moose was illegally killed no doubt had a persuasive impact on the superior court in reading an intent requirement into the regulation. By interpreting the regulation to embody a reasonable person standard in the phrase "knew or should have known," the superior court concluded that the regulation was not void for vagueness.

A recent treatment of a claim of void for vagueness is found in this court's opinion in *Holton v. State*, 602 P.2d 1228 (Alaska 1979). In *Holton*, we set forth three factors that are applicable in considering such a claim:

> First, a statute may not be so imprecisely drawn and overbroad that it 'chills' the exercise of first amendment rights. The second consideration is that in order to be consistent with notions of fundamental fairness a statute must give adequate notice of the conduct that is prohibited. The final element in an analysis of statutory vagueness is whether the statute's imprecise language encourages arbitrary enforcement by allowing prosecuting authority undue discretion to determine the scope of its prohibitions.[13]

The first is not applicable here, since the regulation does not concern First Amendment rights of speech, religion, association and expression.[14] The third consideration is also not applicable since recent cases have stated that this court "will not invalidate a statute on these grounds unless there is some history of arbitrary or selective enforcement"[15] and there was no showing of such a history in this case.

■ Thus, it is on the second of these factors, that of adequate notice, that a claim of void for vagueness must rest. In *Stock v. State*, 526 P.2d 3, 8 (Alaska 1974), we noted:

> The second consideration is that a statute must give adequate notice to the ordinary citizen of what is prohibited. This principle involves basic fairness and was long ago enunciated by the United States Supreme Court in *Connally v. General Construction Co.* [269 U.S. 385, 46 S.Ct. 126, 70 L.Ed. 322], stating:
>
>> That the terms of a penal statute creating a new offense must be sufficiently explicit to inform those who are subject to it what conduct on their part will render them liable to its penalties is a well-recognized requirement, consonant alike with ordinary notions of fair play and the settled rules of law; and a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential of due process of law.
>
> A statute in its broad contours may be subject to criticism for failure to give adequate notice as to all types of conduct which are punishable, but, when not involved with the 'overbreadth' problem,

---

13. *Holton v. State*, 602 P.2d 1228, 1235–36 (Alaska 1979), *quoting Summers v. Anchorage*, 589 P.2d 863, 866–67 (Alaska 1979) (footnotes omitted).

14. *See, e. g., Larson v. State*, 564 P.2d 365, 372 (Alaska 1977) ("The criminal acts with which Larson was charged do not involve the exercise of these [First Amendment] rights, so this consideration is not pertinent.").

15. *Holton v. State*, 602 P.2d 1228, 1237 (Alaska 1979); *see Summers v. Anchorage*, 589 P.2d 863, 868 (Alaska 1979).

may still pass muster if: (a) there can be no question as to its applicability to the particular offense involved, and (b) a construction may be placed upon the statute so that in the future the type of offenses coming within its purview may reasonably be understood. [footnotes omitted] We find with the superior court that the statute is overbroad and that a proper limiting construction, implying a "know or reasonably should know" standard, is necessary to render the regulation constitutional.

In this case, we note that other state regulations concerning possession of illegally taken wildlife, specifically shrimp and crab, require criminal intent and take the form, "It is unlawful for any person to possess [shrimp or crab] . . . if that person knows or has reason to know that such shrimp were taken or possessed in contravention of the regulations of this chapter." [16] We conclude that identical language implying at least the element of negligence must be read into 5 AAC 81.140(b). Therefore, we affirm the superior court's setting aside of Rice's conviction because of the district court's failure to instruct the jury on this element of the alleged offense.

 We note, additionally, that an alternative analysis compels the same result. Under the Alaska Constitution, "[s]ubstantive due process is denied when a legislative enactment has no reasonable relationship to a legitimate governmental purpose." *Con-*

*cerned Citizens of South Kenai Peninsula v. Kenai Peninsula Borough*, 527 P.2d 447, 452 (Alaska 1974). *See also Mobil Oil Corporation v. Local Boundary Commission*, 518 P.2d 92, 101 (Alaska 1974). For the reasons discussed above, we believe that if enforced according to its literal terms, as imposing liability on any person who possesses or transports illegally taken game without regard to whether such person knew or should have known of the illegality, 5 AAC 81.-140(b) would bear no reasonable relationship to the legitimate regulatory purpose underlying it. We are therefore persuaded that the superior court's interpretation of 5 AAC 81.140(b) is required by substantive due process principles as well as by the void for vagueness rationale relied upon by this court.

Cessna has urged that both substantive and procedural due process have been or will be violated by forfeiture of Rice's airplane, in which Cessna has a security interest.[17] We first consider whether substantive due process is violated by the act of forfeiture itself, since such a finding would require return of the plane and would render the question of procedural due process moot.

The question before the court specifically is whether the superior court erred in failing to grant summary judgment for defendant Cessna Finance in the civil forfeiture action initiated by the state. Given its security interest in the airplane and its inno-

---

**16.** 5 AAC 31.090(c) provides:

(c) It is unlawful for any person to possess, purchase, barter, sell, or transport shrimp within the state or within waters subject to the jurisdiction of the state if that person knows or has reason to know that such shrimp were taken or possessed in contravention of the regulations of this chapter.
5 AAC 32.090(c) provides:

(c) It is unlawful for any person to possess, purchase, barter, sell or transport dungeness crab within the state or within waters subject to the jurisdiction of the state if that person knows or has reason to know that such dungeness crab were taken or possessed in contravention of the regulations of this chapter.
5 AAC 34.090(c) provides:

(c) It is unlawful for any person to possess, purchase, sell, barter, or transport king crab

within the state or within waters subject to the jurisdiction of the state if that person knows or has reason to know that such king crab were taken or possessed in contravention of the regulations of this chapter.
These regulations were promulgated pursuant to AS 16.10.210 which provides:

*Unlawful sale or offer prohibited.* It is unlawful for a person to possess, purchase, offer to purchase, sell, or offer to sell in the state migratory fish or migratory shellfish taken on the high seas knowing that they were taken in violation of a regulation promulgated by the Board of Fisheries governing the taking of migratory fish or migratory shellfish in certain areas designated by the Board of Fisheries or the commissioner.

**17.** Cessna's security interest was $36,953.16 plus a substantial amount of interest.

cence in respect to the criminal offense upon which the forfeiture is based, Cessna contends that the civil forfeiture statute, AS 16.05.195,[18] deprives it of a property right without just compensation. Cessna does not contend that forfeiture is unconstitutional in respect to Rice, the titleholder of the airplane, but only as to itself as innocent holder of a security interest in the plane.

The subject of forfeitures and their application to innocent parties' property was recently considered at length by the Supreme Court in *Calero-Toledo v. Pearson Yacht Leasing Co.*, 416 U.S. 663, 94 S.Ct. 2080, 40 L.Ed.2d 452 (1974). In *Pearson Yacht*, a yacht owned by Pearson had been leased to two persons, one of whom used it for transportation of marijuana, and thus it was subject to seizure under a Puerto Rican forfeiture statute. The Supreme Court, in determining that there was no constitutional violation in such seizure, offered a succinct discussion of the applicable law in this area at 679–683, 94 S.Ct. at 2089–2092, 40 L.Ed.2d at 466–67.

As that Court observed, the history of forfeiture is deeply rooted in the common law with even Biblical origins.[19] It has received widespread use and approval throughout the history of American jurisprudence.[20] "Despite this proliferation of

forfeiture enactments, the innocence of the owner of property subject to forfeiture has almost uniformly been rejected as a defense." [21]

The first suggestion for qualification came in the Supreme Court's opinion in *United States v. United States Coin & Currency*, 401 U.S. 715, 91 S.Ct. 1041, 28 L.Ed.2d 434 (1971), which seemed to indicate that lack of significant involvement in the criminal enterprise was a defense. Subsequently, in *Pearson Yacht*, the Supreme Court stated that such a conclusion was wrong. "*Coin and Currency* did not overrule prior decisions that sustained application to innocence of forfeiture statutes, like the Puerto Rican statutes, not limited in application to persons 'significantly involved in a criminal enterprise.'" [22] The Court noted two instances in which constitutional questions might still arise. The first, if the property had been seized when it was used without the owner's consent,[23] is not applicable in this case. The second instance alluded to by the Supreme Court involves "an owner who proved not only that he was uninvolved in and unaware of the wrongful activity, but also that he had done all that reasonably could be expected to prevent the proscribed use of his property." [24] Cessna argues that this latter cir-

**18.** *See* note 4 *supra*.

**19.** *Calero-Toledo v. Pearson Yacht Leasing Co.*, 416 U.S. 663, 681, 94 S.Ct. 2080, 2090, 40 L.Ed.2d 452, 466–67 (1974). For a comprehensive discussion of the history of forfeiture, *see* J. Finkelstein, *The Goring Ox: Some Historical Perspectives on Deodands, Forfeitures, Wrongful Death and the Western Notion of Sovereignty*, 46 Temple L.Q. 169 (1973).

**20.** [A]lmost immediately after the adoption of the Constitution, ships and cargoes involved in customs offenses were made subject to forfeiture under federal law, as were vessels used to deliver slaves to foreign countries, and somewhat later those used to deliver slaves to this country. The enactment of forfeiture statutes has not abated; contemporary federal and state forfeiture statutes reach virtually any type of property that might be used in the conduct of a criminal enterprise.
416 U.S. at 683, 94 S.Ct. at 2092, 40 L.Ed.2d at 468 (footnote omitted).

**21.** *Id.* See also *United States v. One 1967 Cadillac Coupe Eldorado*, 415 F.2d 647, 648–49 (9th Cir. 1969), and cases cited therein; *United States v. One 1950 Burger Yacht*, 395 F.Supp. 802, 803 (S.D.Fla.1975).

**22.** 416 U.S. at 688, 94 S.Ct. at 2094, 40 L.Ed.2d at 471.

**23.** [I]t would be difficult to reject the constitutional claim of an owner whose property subjected to forfeiture had been taken from him without his privity or consent.
416 U.S. at 689, 94 S.Ct. at 2094, 40 L.Ed.2d at 471.

**24.** *Id.* (footnote omitted).
In *F/V American Eagle v. State*, 620 P.2d 657, 666–68 (Alaska 1980), we considered a claim by owners of a seized fishing vessel that they were entitled to remission as innocent third parties. On the facts, we determined that all the owners were active business partners in the fishing vessel's activity and failed to dem-

cumstance is parallel to its position in the case at bar. In such circumstances, the Supreme Court noted that "it would be difficult to conclude that forfeiture served legitimate purposes and was not unduly oppressive."[25]

The primary purpose for forfeiture as noted by the Supreme Court in *Pearson Yacht* is as follows:

> Forfeiture of conveyances that have been used—and may be used again—in violation of the narcotics laws fosters the purposes served by the underlying criminal statutes, both by preventing further illicit use of the conveyance and by imposing an economic penalty, thereby rendering illegal behavior unprofitable. To the extent that such forfeiture provisions are applied to lessors, bailors, or secured creditors who are innocent of any wrongdoing, confiscation may have the desirable effect of inducing them to exercise greater care in transferring possession of their property.[26]

This passage clearly suggests that under federal constitutional due process, forfeiture of the interest of an innocent security holder, rather than that of an owner, is not violative of substantive due process, and does not come under the exception noted above. Several federal courts[27] and state courts[28] have so held.

Cessna asks, however, that we review its claim under the substantive due process clause of the Alaska Constitution. As we have previously noted, although this court is bound to enforce constitutional protections under the Federal Constitution, we also have a concomitant duty to develop constitutional rights under the Alaska Constitution:

> if we find such fundamental rights and privileges to be within the intention and spirit of our local constitutional language and to be necessary for the kind of civilized life and ordered liberty which is at the core of our constitutional heritage. We need not stand by ... waiting for constitutional direction from the highest court of the land. Instead, we should be moving concurrently to develop and expound the principles embedded in our constitutional law.

*Baker v. City of Fairbanks,* 471 P.2d 386, 402 (Alaska 1970) (footnotes omitted).

Cessna's claim under both the Federal and State Constitutions is largely based on the lack, under the Alaska statutory scheme, of a remissions procedure. Alaska's forfeiture statute only allows for remission when an innocent buyer subsequently purchases, in good faith, property subject to forfeiture.[29] It makes no provision for remission to an innocent owner or security holder.[30] On the other hand, the

---

onstrate that they had done all that reasonably could be expected to prevent the proscribed use of the property.

**25.** 416 U.S. at 689–90, 94 S.Ct. at 2095, 40 L.Ed.2d at 472.

**26.** *See* note 38 *infra* and accompanying text.

**27.** *See United States v. One 1969 Plymouth Fury Auto,* 476 F.2d 960, 961 (5th Cir. 1973), *reh. denied,* 509 F.2d 1324, *cert. denied sub nom. Ford Motor Credit Co. v. United States,* 423 U.S. 838, 96 S.Ct. 65, 46 L.Ed.2d 57 (1975); *United States v. One 1967 Ford Mustang,* 457 F.2d 931 (9th Cir.), *cert. denied sub nom. Bank of America Nat'l Trust & Savings Ass'n v. United States,* 409 U.S. 850, 93 S.Ct. 59, 34 L.Ed.2d 92, *reh. denied,* 409 U.S. 1050, 93 S.Ct. 512, 34 L.Ed.2d 503 (1972).

**28.** *See, e. g., Commonwealth v. One 1977 Pontiac Grand Prix Auto,* 378 N.E.2d 69, 72 (Mass. 1978); *Dillon v. Barefoot,* 88 Misc.2d 887, 389 N.Y.S.2d 513 (N.Y.Sup.1976).

**29.** AS 16.05.195(e) provides:

> No forfeiture may be made of an item subsequently sold to an innocent purchaser in good faith. The burden of proof as to whether the purchaser purchased the item innocently and in good faith shall be on the purchaser.

**30.** A bill was before the Alaska legislature in the 1979 session to provide for remission and adopt procedures for remission in this situation. Committee Substitute for S.B. 7, 11th Leg., 1st Sess. (1979). The bill provided for a new statute which would have read, in part:

> (d) If an item specified in AS 16.05.190(a) is forfeited, a claimant who holds an interest in the item and has filed a timely claim, may petition the court in which the action is pending for remittance of his interest upon showing at a hearing before the court as trier of fact that
> (1) he holds a valid interest in the item and
> (2) he was not a consenting party to nor privy to the illegal act.

state notes that remission for forfeitures and fines is available by application to the governor under his power of executive clemency:

> Subject to procedure prescribed by law, the governor may grant pardons, commutations, and reprieves, and may suspend and remit fines and forfeitures.

Alaska Const. Art. III, § 21. Cessna argues that this is not a substitute for an administrative remission procedure and that no procedures have been established for remission under executive clemency.

■ Cessna also points to the text of a footnote in *Pearson Yacht* in which the Supreme Court notes the long history of federal provisions for remission of forfeited property to innocent owners:

> Since 1790 the Federal Government has applied the ameliorative policy—first adopted in England—of providing administrative remissions and mitigations of statutory forfeitures in most cases where the violations are incurred 'without willful negligence' or an intent to commit the offense. Indeed, forfeitures incurred under 21 U.S.C. § 881(a), which served as the model for enactment of the disputed Puerto Rican statute, are subject to the remission and mitigation procedures of 19 U.S.C. § 1618. Regulations implementing § 1618 provide that, if the seized property was in the possession of another who was responsible for the act which resulted in the seizure, the petitioner must produce evidence explaining the manner in which the other person acquired possession and showing that, prior to parting with the property, he did not know or have reasonable cause to believe that the property would be used in violation of the law or that the violator had a criminal record or a reputation for commercial crime. 19 CFR § 171.13(a). These provisions are also extended to those individuals holding chattel mortgages or conditional sales

contracts. 19 CFR § 171.13(b). See also 18 U.S.C. § 3617(b) establishing standards for judicial remission and mitigation of forfeitures resulting from violations of the internal revenue laws relating to liquor.[31]

The importance of a remission procedure has also been noted in several other cases.[32] The state argues that none of these cases hold that remission is constitutionally required. However, after careful consideration, we are persuaded that a remission procedure is mandated under the Alaska Constitution. Not to allow innocent owners and security holders to show that they have not been involved in the criminal activity that triggered the forfeiture proceeding violates Alaska's constitutional due process provision.

The law of forfeiture, as already noted, is of ancient origin dating back to Biblical times. The theory of civil forfeiture is that the action is in rem, against the object. As the Supreme Court noted in *United States Coin & Currency*:

> [F]orfeiture actions have proceeded upon the fiction that inanimate objects themselves can be guilty of wrongdoing. .... The forfeiture action in the present case was instituted as an in rem proceeding in which the money itself is the formal respondent. More remarkable, the Government's complaint charges the *money* with the commission of an actionable wrong. [footnotes omitted] [emphasis in original]

401 U.S. at 719–20, 91 S.Ct. at 1044, 28 L.Ed.2d at 438. Although the implicit fiction in forfeiture actions is often acknowledged by courts, lingering concepts derived from that fiction have kept forfeitures from receiving clear analysis. As one commentator noted:

> An automobile that had been used to violate the revenue laws, or the narcotics laws is not a 'dangerous' res. .... It is

---

**31.** *Calero-Toledo v. Pearson Yacht Leasing Co.,* 416 U.S. 663, 689 n.27, 94 S.Ct. 2080, 2095 n.27, 40 L.Ed.2d 452, 471 n.27 (1974) (citations omitted).

**32.** *United States v. United States Coin & Currency,* 401 U.S. 715, 721, 91 S.Ct. 1041, 1044, 28 L.Ed.2d 434, 439 (1971); *United States v. One 1976 Lincoln Mark IV,* 462 F.Supp. 1383 (W.D. Pa.1979); *United States v. One 1974 Mercury Cougar,* 397 F.Supp. 1325 (C.D.Cal.1975).

neither more nor less dangerous to the public welfare or safety than any other automobile. The simple proof of the distinction, of course, is that such confiscated automobiles are not in fact destroyed, but are ultimately sold, their proceeds going to the public treasury, while the cars themselves, having publicly 'expiated' for being 'offending reae,' may resume their normal 'life' on the public highways. The ox that gored a person to death was treated as a real felon—as were all those domestic animals that were tried before regular courts in the Middle Ages for causing the death of a person—and was duly executed. The procedure was the natural consequence of a bona fide concern about a human life and not a subterfuge by means of which the authorities were aiming to penalize the owner of the beast. The modern doctrine of the offending res, on the other hand, is a deliberate subterfuge—a judicial fiction, by resort to which the sovereign, with the sanction of the courts, can impose a punishment on a blameless individual who is thereby deliberately left without recourse to his constitutional rights of due process.[33]

What purpose is left then to forfeiture if it is not to destroy and expiate the offending res? One purpose is to prevent possible use of the property in further illicit acts.[34] This purpose is well served when the seized property is not returned to the offender. It is not served when the interests of innocent non-negligent third parties are left unprotected or uncompensated. All that remain as purposes for forfeiture are the goals generally advanced for penal measures.[35]

If this is accurate, then what purpose is served by punishing the owner who has done all that reasonably could be expected to prevent illegal use? Or in punishing a security holder who has an interest in the forfeited item and has done everything possible to prevent its illegal use, especially considering the minimal control that a security holder has over an item whose ownership is in the hands and direct control of another? The Supreme Court, in *Pearson Yacht*, stated that as to secured creditors, "confiscation may have the desirable effect of inducing them to exercise greater care in transferring possession of their property."[36] We think that limits must be recognized as to the care a creditor can be required to take to safeguard a security interest. We think that if a party can show "the manner in which the property came into possession of such other person" and that "prior to parting with the property he did not know, nor have reasonable cause to believe, [either] that the property would be used to violate [the law, or] ... that the violator had a criminal record or a reputation for commercial crime,"[37] substantive due process under the Alaska Constitution requires that a procedure be available for remission of the forfeited item.

Here, Cessna Finance has asserted it is an innocent holder of an interest in the seized airplane which did all it could reasonably be expected to do. We conclude that Cessna has been deprived of its constitutional rights to substantive due process through the failure of the statutory scheme relating to forfeitures to provide for remission of the interests of innocent non-negligent third parties in the forfeited item.

**33.** *See* J. Finkelstein, *supra* note 19, at 252.

**34.** *Calero-Toledo v. Pearson Yacht Leasing Co.,* 416 U.S. 663, 687, 94 S.Ct. 2080, 2094, 40 L.Ed.2d 454, 470 (1974); *F/V American Eagle v. State,* 620 P.2d 657, 668 (Alaska 1980).

**35.** *See State v. Chaney,* 477 P.2d 441, 444 (Alaska 1970).

**36.** *Calero-Toledo v. Pearson Yacht Leasing Co.,* 416 U.S. 663, 686–88, 94 S.Ct. 2080, 2093–2094, 40 L.Ed.2d 452, 470–71 (1974). The Court also noted:

> Seizure and forfeiture statutes also help compensate the Government for obtaining security for subsequently imposed penalties and fines. [citations omitted]
> 416 U.S. at 687 n.26, 94 S.Ct. at 2094 n.26, 40 L.Ed.2d at 470 n.26. We do not find these interests compelling when the seizure involves property of innocent owners and security holders.

**37.** 19 CFR § 171.13(a).

Thus, the case is remanded to the superior court to hold a remission hearing. If Cessna Finance can make the requisite showing,[38] it is entitled to reimbursement from the state for its share in the forfeited airplane at the time of seizure.

Having determined that the forfeiture itself violated substantive due process, we need not consider whether the superior court was correct in finding that procedural due process was also violated.

AFFIRMED in part; REVERSED in part.

BOOCHEVER, J., not participating.

MATTHEWS, Justice, concurring.

I agree with the result of the majority opinion. However, the majority's reasons for imposing a mens rea requirement as a part of 5 AAC 81.140(b) seem to me to be somewhat unfocused.

The majority's first reason is that without a mens rea requirement the regulation is overbroad and is therefore void for vagueness. The concept of overbreadth as it is used in vagueness cases refers to a lack of fair notice as to what conduct is punishable. *Stock v. State*, 526 P.2d 3, 8 (Alaska 1974). Here there is fair notice in the sense that the regulation is linguistically precise in delineating the type of conduct proscribed. The problem with it is that it includes within its ambit the conduct of people who have no reason to believe that what they are doing is criminal. I suggest, therefore, that the vagueness rationale does not support the conclusion reached.

The alternative reason set out by the majority strikes down the regulation because it has no reasonable relation to a legitimate governmental purpose. Once again, this is at best a tangential expression of what is wrong with the regulation. There certainly is a legitimate government interest in preventing the unlawful killing

of game, and imposing strict forfeiture or criminal fines on persons who transport unlawfully killed game bears a relationship to the accomplishment of that purpose.

I would require mens rea as an element of this regulation because the penalty for its violation includes a possible six-month term of imprisonment. *See* AS 16.05.900(a). In my view due process requires that there be a culpable mental state in every case where a sentence of imprisonment may be imposed. Although we have never unconditionally adopted such a rule, our cases suggest that it is appropriate.

In *Speidel v. State*, 460 P.2d 77 (Alaska 1969) we held that a culpable mental state must exist for there to be a conviction of a crime. We recognized a "public welfare offense" exception to this rule, and noted that such offenses are characterized by relatively small penalties, and conviction of them does not significantly damage one's reputation. *Id.* at 79.

In *Alex v. State*, 484 P.2d 677, 681 (Alaska 1971), we reaffirmed the principles of *Speidel* and noted "the necessity of basing serious crimes upon a general criminal intent as opposed to strict criminal liability which applies regardless of intention," the goal being to "avoid criminal liability for innocent or inadvertent conduct." *Accord Kimoktoak v. State*, 578 P.2d 594 (Alaska 1978); *State v. Guest*, 583 P.2d 836 (Alaska 1978).

Likewise, in the recent case of *Hentzner v. State*, 613 P.2d 821, 825 (Alaska 1980), we noted that the " 'general conditions of penal liability' require 'not only the doing of some act by the person to be held liable, but also the existence of a guilty mind during the commission of the act.' "

These cases establish that mens rea is an essential element for criminal liability, except as to crimes for which the penalties are relatively small, and do minimal damage to

**38.** The state argues that Cessna had not done anything more than a routine credit check. However, it seems that Rice had neither a prior criminal record nor a record or reputation as a game law violator. If the inquiry would have revealed nothing, the loan was made in good faith. If Cessna had no knowledge that Rice was a violator of the game laws and was not negligent in its inquiry, it is entitled to remission. *Cf. United States v. One 1972 Ford Pickup Truck*, 374 F.Supp. 413, 415 (E.D.Tenn. 1973).

the offender's reputation. In my view, any prison sentence is an important, even traumatic, event in the life of a human being, especially one who conducts his affairs with an intent to conform to the norms required by law. Further, any prison sentence is likely to have a considerable detrimental effect on one's reputation. The laws of our society should not be structured so that an individual may be jailed for conduct which he reasonably believes to be lawful. Therefore, I believe that a mens rea requirement should be imposed in all cases in which the penalty may be incarceration.[1]

Many commentators agree with this position. For example, in F. Sayre's article, *Public Welfare Offenses,*[2] he notes that the severity of the penalty represents a cardinal principle upon which to determine whether mens rea should be required. He concludes that if the possible penalty is serious, particularly if it involves imprisonment, the defendant's individual interest weighs too heavily to allow conviction without proof of mens rea:

> To subject defendants entirely free from moral blameworthiness to the possibility of prison sentences is revolting to the community sense of justice; and no law which violates this fundamental instinct can long endure. Crimes punishable by prison sentences, therefore, ordinarily require proof of a guilty intent.[3]

*Accord* W. LaFave & A. Scott, Handbook on Criminal Law § 31 at 218 (1972); Model Penal Code § 2.05, Comments (Tent. Draft No. 4, 1955).

For these reasons I agree that a mens rea element should be read into 5 AAC 81.-140(b).

---

1. The possibility of incarceration is a dividing line between serious and non-serious crimes for other purposes in the criminal law such as the right to trial by jury and to court appointed counsel. *Alexander v. City of Anchorage*, 490 P.2d 910, 915 (Alaska 1971); *Baker v. City of Fairbanks*, 471 P.2d 386, 401–02 (Alaska 1970).

2. F. Sayre, *Public Welfare Offenses*, 33 Colum. L.Rev. 55 (1933).

